## A04A0092. McFANN v. SKY WARRIORS, INC.
## A04A0093. BOUCK v. SKY WARRIORS, INC.
### (603 SE2d 7)

BARNES, Judge.

Barbara McFann and Margaret Murray Bouck appeal the grants of summary judgment to Sky Warriors, Inc., in both these cases. The appellants in these actions, McFann and Bouck, are the widows of the pilots killed in an aircraft crash. They contend the trial court erred because the exculpatory agreements that Sky Warriors relied upon do not bar their claims.

Mrs. McFann's complaint alleged that Sky Warriors had negligently selected the aircraft for use in aerial combat, negligently maintained the aircraft, breached its warranty, and negligently and intentionally misrepresented the safety and condition of the aircraft. She also alleged that Sky Warriors was guilty of gross negligence and wilful and wanton conduct in its selection and maintenance of the aircraft.

Mrs. Bouck's complaint alleged that Sky Warriors was in the business of taking passengers for rides in their aircraft and engaging in simulated aerial combat. While engaged in that business, the right wing of one of Sky Warriors' aircraft, without warning, separated from the plane, causing the death of her husband, who was one of the pilots on board. Mrs. Bouck brought the action both as the executrix of her husband's estate and in her capacity as his surviving spouse. She alleged that Sky Warriors was negligent by selecting a 40-year-old aircraft with extremely high airframe time, with a high probability of serious airframe fatigue and fatigue failures as well as damage due to harsh use as a military trainer. She also asserted that Sky Warriors failed to perform proper maintenance on the aircraft. She further alleged that Sky Warriors was liable because it breached a warranty that it would ensure absolute safety, negligently misrepresented that its aircraft were safe, and intentionally misrepresented that its aircraft were safe when it knew or should have known that they were not. Mrs. Bouck later filed an amended complaint asserting that Sky Warriors' actions rose to the level of wilful and wanton misconduct or gross negligence.

After Sky Warriors answered denying liability, it moved for summary judgment on the appellants' claims, contending that it was entitled to summary judgment because each of the deceased pilots had signed exculpatory agreements releasing it from liability, because no cause of action for wrongful death can be based on breach of warranty without negligence or criminal misconduct, and because the evidence did not support a claim for intentional misrepresentation. Mrs. McFann and Mrs. Bouck responded, however, that the

exculpatory agreements cannot bar actions based on gross negligence or wilful and wanton conduct, and the exculpatory agreements were not enforceable because they were fraudulently induced, ambiguous, and against public policy. Nevertheless, the trial court granted both motions, and these appeals followed. Because both appeals arise from the crash of the same airplane and concern almost identical issues, we have consolidated them for disposition on appeal.

Mrs. McFann contends the trial court erred by granting summary judgment because (1) the exculpatory agreement is unenforceable against actions for gross negligence and wanton conduct, (2) the exculpatory agreement was induced by fraud, (3) the exculpatory agreement cannot be enforced because it is ambiguous as a matter of law, and (4) the exculpatory agreement is void as against public policy. Mrs. McFann also alleges that the trial court erred by granting summary judgment because the evidence shows that Mr. Bouck was Sky Warriors' employee and not an independent contractor.

Mrs. Bouck contends the trial court erred because (1) the language of the alleged exculpatory agreement creates a jury question in that it excepts from the general terms of the exculpatory agreement liability arising solely from Sky Warriors' negligence or wanton conduct to the extent liability insurance coverage is available, (2) Sky Warriors may not disclaim its gross negligence and wilful, wanton misconduct, (3) the language of the exculpatory agreement is contradictory, and (4) the exculpatory agreement is not effective because a bailment was created when Sky Warriors provided the plane for Mr. Bouck's use. Mrs. Bouck also contends the exculpatory agreement is contrary to the public policy of Georgia.

In Case No. A04A0092, Mrs. McFann's appeal, we find that in Georgia a party may not obtain an exculpatory agreement for its gross negligence or wilful misconduct, and that a jury question exists on whether Sky Warriors reached that level of culpability. In Case No. A04A0093, Mrs. Bouck's appeal, we also find that a jury question exists on whether Mr. Bouck's death resulted from Sky Warriors' gross negligence or wilful or wanton conduct, and also find that the exculpatory agreement in question does not release Sky Warriors from liability arising from its sole negligence and wanton conduct. Accordingly, we must reverse the grants of summary judgment in both cases.

1. The standards applicable to motions for summary judgment are announced in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 595-596 (370 SE2d

843) (1988). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence. *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997).

On motions for summary judgment, the court cannot resolve the facts or reconcile the issues. *Fletcher v. Amax, Inc.*, 160 Ga. App. 692, 695 (288 SE2d 49) (1981). Although negligence cases are rarely subject to final adjudication by motion for summary judgment, in cases where the existence or nonexistence of liability is plain, palpable, and indisputable, summary judgment may be granted. *Ellington v. Tolar Constr. Co.*, 237 Ga. 235, 237 (227 SE2d 336) (1976).

2. Viewed most favorably toward the appellants, the record shows that these wrongful death actions arise from the crash of a single engine airplane that was owned and operated by Sky Warriors. Sky Warriors was in the business of renting its aircraft for flight training and also for use in simulated aerial combat. In the latter case, those renting the airplanes were allowed to fly the planes, but Sky Warriors' safety pilots accompanied them and were responsible for the safety of the flight. In this case, Daniel L. Bouck was the safety pilot of the plane and Ted McFann was the pilot. Mr. McFann was in the front seat and Mr. Bouck was in the rear seat. Both Mr. Bouck and Mr. McFann had been pilots for Delta AirLines and Bouck was a former military pilot. While they were engaged in simulated aerial combat with another Sky Warriors aircraft, the right wing of their airplane came off in mid-flight. The plane fell to the ground and both men were killed. The wing broke off at points where evidence of metal fatigue was later found.

The appellants contend the evidence shows the wing broke off when the plane was pulling fewer than six Gs and it was not being operated outside of its structural limitations. They also contend the plane's metal fatigue was where the wing broke off.

In its simulated aerial combat flights, Sky Warriors operated T-34A aircraft manufactured in the 1950s by Beech Aircraft Corporation, the predecessor of Raytheon Aircraft Company. The manufacturer's operating instructions approved the T-34A for aerobatic maneuvers. Purchased originally by the United States Air Force for training pilots, the Air Force later sold the planes to civilians.

Sky Warriors contends the alleged fatigue cracks in the plane's wing did not cause the wing to break off because the wing did not separate at those locations. Further, the person conducting the x-ray of the plane's wing testified that every plane has cracks in it.

The instructor agreement that Mr. Bouck signed provides that

[e]xcept as set forth herein, Sky Warriors shall not be responsible, or be held liable, for any injury or damage to any person

(including Instructor) or property resulting from the use, misuse, or failure of any equipment used by Instructor, any of Instructor's employees, or anyone affiliated with Sky Warriors, even if such equipment is furnished, rented or loaned to Instructor by Sky Warriors. The acceptance or use of any such equipment by Instructor, or any of Instructor's employees, shall be construed to mean that Instructor accepts full responsibility for, and agrees to release, waive, and forever discharge Sky Warriors, Inc., its officers, directors, shareholders, employees, and each of them (hereinafter collectively as SWI) from, any liability to Instructor, his or her spouse, legal representative, heirs, assigns, children, or anyone claiming by or through Instructor, for any loss, liability, demand, action, cause of action, or claim for any injury or damage whatsoever to the Instructor or his property, including without limitation injury resulting in the death of the Instructor, whether caused by the negligence of SWI, or any of them, or otherwise, resulting from the use, misuse, or failure of such equipment; *provided, however, that Sky Warriors shall satisfy any legal liability for injuries or damage to the Instructor or his property if such liability arises solely from the negligence or wilful misconduct of Sky Warriors, and provided further that the amount paid in satisfaction of such liability shall not exceed the insurance coverage provided under the existing insurance policy of Sky Warriors, reduced by any retained risk under such policy.*

(Emphasis supplied.)

The agreement that Mr. McFann signed stated that

[i]n consideration of being permitted to participate in an aerial flight involving simulated aerial combat, aboard an aircraft owned by Sky Warriors, Inc., Participant hereby releases, waives, and forever discharges Sky Warriors, Inc., its officers, directors, shareholders, employees, independent contractors, and each of them (hereinafter collectively referred to as SWI), from all liability to Participant, his or her spouse, legal representatives, heirs, assigns, children, or anyone claiming by or through Participant, for any loss, damage, liability, claim, demand, action, cause of action, cost, or damages resulting therefrom, on account of injury to Participant's person or property that occurs while Participant is on the premises of Sky Warriors, Inc., or while participating in the aforementioned flight, including without

limitation injury resulting in the death of the Participant, whether caused by the negligence of SWI, or any of them, or otherwise.

Participant agrees to indemnify and hold harmless SWI, and each of them, against any loss, damage, liability, claim, demand, action, cause of action, cost or damage resulting therefrom that they may incur due to the presence of Participant in or upon the premises of Sky Warriors, Inc., or aboard any one of the aircraft used or owned by Sky Warriors, Inc. or whether caused by the negligence of SWI, or any of them, or otherwise.

Being duly aware of the risks and hazards associated with the aforementioned flight, Participant hereby voluntarily assumes full responsibility for the risk of bodily injury, death, or property damage due to the negligence of SWI, or any of them, or otherwise that occurs while Participant is in or upon the premises of Sky Warriors, Inc., aboard any one of the aircraft used or owned by Sky Warriors, Inc., or participating in the aforementioned flight.

Participant expressly agrees that this release, waiver, and indemnity agreement is intended to be as broad and inclusive as permitted by the laws of the State of Georgia, and that if any portion hereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

The appellants' allegations regarding gross negligence and wilful and wanton conduct are based on Sky Warriors' actions following an incident three years before the crash when a damaged wing spar was discovered in a sister ship of the aircraft involved in this litigation, and the spar had to be replaced.

As a result, Sky Warriors had the wings x-rayed on all its planes to see if the spar cap in the wings were damaged, and to give Sky Warriors information about the condition of the wings. On the first plane, not the plane that crashed, one could see ripples in the skin on the top of the wing.

Sky Warriors inspected the wing spars on the aircraft that crashed and an x-ray showed cracks in the wing spar. A crack-like indication was observed in the top cap view, but a second x-ray did not show the crack. Then, they tested the wing with an "eddy current" device to validate the x-ray results. When the tester did, he could not validate the crack in the wing. Nevertheless, the employee of the company performing the test felt confident that the plane had a crack. Two x-rays were taken and one showed the crack while the other did

not. This did not mean, however, that the indication of the crack could be ignored. The crack could not be seen with the naked eye.

Even though an eddy current test has a high degree of sensitivity, an eddy current test does not always confirm the same finding as an x-ray, and an eddy current would not show defects below the spar cap. The eddy current is primarily a surface indicator and cannot get a reading below approximately 3/16th of an inch.

The x-ray report of the wing said "reject — crack." Sky Warriors, however, did not replace the wing spar, because it contends that the eddy current test showed the cracks were only cracks in the paint and not in the wing. Sky Warriors' owner stated that he would not have flown the plane in aerobatics if he thought anything was wrong with it. He was adamant that the x-ray detected a mere flaw in the paint.

After consultation with the firm that had performed the x-rays and with his mechanics, the owner concluded that there were no cracks and decided to fly the plane without further tests. He understood that if the eddy current showed no cracks, then no cracks existed. The owner testified that he was "absolutely 100% sure about this one. This was a heart stopper at the time, but when we had the follow up eddy current done, this turned out to be a mere flaw in the paint, in the paint on the airplane. It had nothing to do with a crack of any kind." He also understood that the eddy current superseded the x-ray because it was more accurate. Accordingly, he believed he had no reason to think the three Sky Warriors planes were not airworthy and safe for flight in simulated aerial combat operations. Although nothing was in writing, his conclusion was based on reviewing the x-rays many times, and the x-ray firm's 100 percent assurance that, based on the eddy current, the crack was just a minor flaw in the paint, as in a scrape. Sky Warriors' general manager confirmed this understanding of the events. He says that they found a small crack, but it was paint peeling, about an inch long.

The employee of the company that performed the x-rays, however, stated that he had no knowledge of anyone saying what the owner said they did, and that if the cracks were mere paint flaws, that fact would be noted in the report. While the employee had some recollection of a cover with cracks, he recalled that they removed that cover. He does not remember stating that Sky Warriors could forget about the x-ray results. Further, the testing firm only provided information to Sky Warriors, and not advice or opinion on the capability of the planes to fly. It did not render engineering or metallurgic flight capability opinions, and did not have the ability to determine the airworthiness of the aircraft. They merely report the results for the client to use. Thus, even rejecting a wing because of a crack, did not mean that the plane was not airworthy. Nevertheless,

the report would have stated that the observed crack was in the skin of the aircraft, if that was the case. Normal practice was to review the results with the client.

One of the appellants' experts stated in his affidavit, however, that the plane should not have been considered airworthy with this report. Further, another expert concluded that the plane should not have been considered airworthy without resolution of the crack indication. Nevertheless, Sky Warriors continued to fly the plane.

Although Mrs. McFann and Mrs. Bouck further contend that fatigue cracks were found in the wing of the plane after the crash, Sky Warriors contends these cracks were not at the same place as the cracks that the x-ray showed earlier. Moreover, Sky Warriors asserts that these cracks did not cause the wing to break off because they were in a different location on the wing spar.

According to Sky Warriors, an examination of the aircraft after the crash and review of the on-board videotapes during the flight showed that the wing broke off because the pilots over-stressed the aircraft with the maneuvers they were performing during the simulated aerial combat. The plane was "way out of the envelope. There was a massive overload." From watching the videos of the last flight, Sky Warriors' general manager concluded that Bouck allowed the plane to go beyond the limits the plane was designed to be flown.

Additionally, the owner of the repair facility that replaced the wing spar on the other plane and the chief of that shop both stated that they had viewed the videotape from the crash and were of the opinion that the plane was being flown outside of its design limits when the wing came off. The plane was in severe stress from the maneuvers it was performing.

One of Mrs. McFann's experts opined, however, that the "in flight structural failure was attributable to *fatigue* of the aluminum wing spar (the major load bearing member of the wing)," and that the "[f]atigue of the accident airplane wing took place over a period of time preceding the accident flight." He also asserted that Sky Warriors "was required by [Federal Regulation] 14 CFR 91.403 to maintain its aircraft in an airworthy condition," and that an "airplane with a fatigue crack in a wing spar is not airworthy unless it is inspected and repaired in accordance with the manufacturer's recommendations."

To show that Sky Warriors was grossly negligent or that it engaged in wilful or wanton conduct, the appellants also point to Sky Warriors' actions in 1996 after the crack was discovered in the wing spar of the other aircraft. They contend that Sky Warriors should have disassembled the wing and transported the wing to Illinois by truck, but instead Sky Warriors flew the plane to Illinois knowing the wing had a crack. Sky Warriors defends its actions because four

different mechanics looked at the wing and said it was safe to fly to Illinois. When the plane arrived at the repair facility in Illinois, the crack was visible, and those at the facility were surprised that Sky Warriors had flown the plane there. It was obvious to them that the wing presented a danger in flight. Both wings had wrinkles in the wing skin and the right wing spar was cracked. The chief of the shop would not have flown it.

The chief of the shop also testified that he saw the plane in Atlanta before it was flown to Illinois and the crack was visible then. He testified that Sky Warriors asked him if the plane could be flown to Illinois, but he told them that an engineer needed to evaluate the plane. He would not have flown the plane.

Sky Warriors had a program of regular inspection of its aircraft based primarily on U. S. Air Force manuals. Moreover, after the results in 1996, it started a program of having the aircraft x-rayed every three years.

3. First, we must reject the appellants' claim that exculpatory clauses are void as against the public policy of this State. *Neighborhood Assistance Corp. &c. v. Dixon*, 265 Ga. App. 255 (593 SE2d 717) (2004).

> It is the paramount public policy of this state that courts will not lightly interfere with the freedom of parties to contract. A contracting party may waive or renounce that which the law has established in his or her favor, when it does not thereby injure others or affect the public interest. Exculpatory clauses in Georgia are valid and binding, and are not void as against public policy when a business relieves itself from its own negligence.

(Citations and punctuation omitted.) *My Fair Lady of Ga. v. Harris*, 185 Ga. App. 459, 460-461 (364 SE2d 580) (1987). Although our law prohibits dispensing or abrogating by agreement the benefit of laws made to preserve public order or good morals, "a person may waive or renounce what the law has established in his favor when he does not thereby injure others or affect the public interest." OCGA § 1-3-7. "A contract cannot be said to be contrary to public policy unless the General Assembly has declared it to be so, or unless the consideration of the contract is entered into for the purpose of effecting an illegal or immoral agreement or doing something which is in violation of law." (Citations omitted.) *Hall v. Gardens Svcs.*, 174 Ga. App. 856, 857 (332 SE2d 3) (1985).

Further,

> [i]t is well settled that contracts will not be avoided by the courts as against public policy, except "where the case is free from doubt and where an injury to the public interest clearly appears. In examining this case we also follow the rule that the courts must exercise extreme caution in declaring a contract void as against public policy and should do so only in cases free from doubt.

(Citation and punctuation omitted.) *Emory Univ. v. Porubiansky*, 248 Ga. 391, 393 (282 SE2d 903) (1981). Considering the nature of the activity in which appellants' husbands were engaging, we find that the covenants did not violate public policy. See *Barbazza v. Intl. Motor Sports Assn.*, 245 Ga. App. 790, 792 (2) (538 SE2d 859) (2000).

4. Although exculpatory clauses are valid and binding and not void as against public policy,

> exculpatory clauses do not relieve a party from liability for acts of gross negligence or wilful or wanton conduct. . . . Gross negligence is defined as the want of slight care and diligence, such care as careless and inattentive persons would usually exercise under the circumstances, want of that diligence which even careless men are accustomed to exercise, carelessness manifestly materially greater than want of common prudence.

(Punctuation and footnotes omitted.) *Colonial Properties Realty v. Lowder Constr. Co.*, 256 Ga. App. 106, 112-113 (5) (567 SE2d 389) (2002). Thus,

> [w]hen facts alleged as constituting gross negligence are such that there is room for difference of opinion between reasonable people as to whether or not negligence can be inferred, and if so whether in degree the negligence amounts to gross negligence, the right to draw the inference is within the exclusive province of the jury.

(Punctuation and footnote omitted.) Id. at 113 (5).

Further, "[w]ilful conduct is based on an actual intention to do harm or inflict injury; wanton conduct is that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent." (Citations and punctuation omitted.) *Chrysler Corp. v. Batten*, 264 Ga. 723, 726 (3) (450 SE2d 208) (1994).

Given the evidence in these appeals, we find that jury questions exist on whether Sky Warriors' gross negligence or wilful or wanton

conduct caused the crash. Although Sky Warriors has a different version of the events, the evidence shows that in 1996 it had the wings of all of its aircraft x-rayed to determine their condition. When the x-rays showed that two of the planes had cracks in their wing spars, Sky Warriors did not have professional engineers determine whether the planes were airworthy. Instead, Sky Warriors informally determined that the cracks were not significant. Then, it flew one plane to Illinois to have the wing repaired, and kept the other plane in service and allowed it to perform simulated aerial combat until the wing broke off in this accident. "[W]anton conduct is that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent." (Citation and punctuation omitted.) *Muller v. English*, 221 Ga. App. 672, 676 (2) (c) (472 SE2d 448) (1996).

Based on this evidence, we find that a jury must decide whether this conduct satisfied Sky Warriors' standard of care or whether it was negligence, gross negligence, or wilful or wanton conduct. Although Sky Warriors argues that the evidence does not support a finding of gross negligence or wilful or wanton conduct, that is not a determination to be made by the court. On motions for summary judgment, the court cannot resolve the facts or reconcile the issues. *Fletcher v. Amax, Inc.*, supra, 160 Ga. App. at 695.

Further, in *Mack Trucks v. Conkle*, 263 Ga. 539, 544-545 (4) (436 SE2d 635) (1993), our Supreme Court sustained an award of punitive damages under the clear and convincing evidence standard when the evidence showed that over a period of years a manufacturer ignored evidence that its trucks had cracks in their frames by finding that the evidence showed a conscious indifference to the consequences. Id. Considering that the issue in these appeals does not require that gross negligence or wanton conduct be established at that higher level of proof, we find the evidence is sufficient to create a jury question on whether Sky Warriors' actions constituted gross negligence or wilful or wanton conduct.

5. In regard to Mrs. Bouck's appeal, Case No. A04A0093, we also find that, by its very terms, the document Mr. Bouck signed was not a complete exculpatory clause releasing Sky Warriors of all liability. The agreement states, in relevant part, that

> Sky Warriors shall satisfy any legal liability for injuries or damage to the Instructor or his property if such liability arises solely from the negligence or wilful misconduct of Sky Warriors, and provided further that the amount paid in satisfaction of such liability shall not exceed the insurance coverage provided under the existing insurance policy of Sky Warriors, reduced by any retained risk under such policy.

Thus, by the terms of its agreement, Sky Warriors could be found liable if a factfinder determined that Mr. Bouck's injuries arose solely from Sky Warriors' negligence or wilful misconduct. Based upon the evidence discussed above, we find that a jury question exists on whether the crash was caused by Sky Warriors' sole negligence or wilful misconduct. In this regard, we note that this provision of the agreement can be satisfied by a finding of only simple negligence.

6. Although it is not apparent that the trial court based its grant of summary judgment on whether Mr. Bouck was an independent contractor, we conclude from the evidence of record, particularly Sky Warriors' training manuals and instructions to the safety pilots, that a question of fact exists on the status Mr. Bouck occupied. These instructions, in great detail, controlled the actions of the safety pilots during Sky Warriors flights.

> The general rule is that an employer is generally not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer. The standards to be considered when determining whether an employer is liable for the negligence of a contractor are set out in OCGA § 51-2-5. Although this list is not exclusive, the only provision realistically at issue is subsection (5): "If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference." . . . The true test whether a person employed is a servant or an independent contractor is whether the employer, under the contract, whether oral or written, has the right to direct the time, the manner, the methods, and the means of the execution of the work, as contra-distinguished from the right to insist upon the contractor producing results according to the contract, or whether the contractor in the performance of the work contracted for is free from any control by the employer of the time, manner, and method in the performance of the work. The right to control the manner and method means the right to tell the employee how he shall go about doing the job in every detail, including what tools he shall use and what procedures he shall follow. The right to control the time of doing the job means the right to control the hours of work.

(Citations and punctuation omitted.) *Bell South Telecommunications v. Widner*, 229 Ga. App. 634, 635-636 (1) (495 SE2d 52) (1997). If an

employment contract clearly identifies a person as an independent contractor, it is presumed that such a relationship exists unless the evidence shows otherwise. If the contract specifies, however, that the employee's status is that of independent contractor, but also provides that the employee is subject to any rules or policies of the employer which may be adopted in the future, no such presumption arises. *Ross v. Ninety-Two West, Ltd.*, 201 Ga. App. 887, 891-892 (3) (412 SE2d 876) (1991). Further, the labeling of a person as an independent contractor in his contract does not determine the actual status of that person and other factors may negate the label. See *Doctors Hosp. of Augusta v. Bonner*, 195 Ga. App. 152, 162 (6) (a) (392 SE2d 897) (1990). Our concern is with essence, and not with nomenclature. *Lee v. Satilla Health Svcs.*, 220 Ga. App. 885, 886 (1) (470 SE2d 461) (1996). Considering the evidence before us under these standards, we find that a question of fact exists on whether Mr. Bouck was an employee or an independent contractor.

Accordingly, we must reverse the grants of summary judgment in both appeals on all of McFann and Bouck's claims and remand the cases to the trial court for further proceedings.

*Judgments reversed. Blackburn, P. J., and Mikell, J., concur in judgment only.*

DECIDED JUNE 24, 2004 —
RECONSIDERATIONS DENIED JULY 28, 2004 —

*Speiser Krause, Daniel D. Barks, Luke B. Marsh, Moraitakis, Kushel, Pearson & Gardner, Nicholas C. Moraitakis, Martha D. Turner*, for appellants.

*Gray & Gilliland, T. Cullen Gilliland, Charles A. Ratz, Mozley, Finlayson & Loggins, J. Arthur Mozley, Anne M. Landrum, James S. Strawinski*, for appellee.

