**WHOLE COURT**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**November 27, 2012**

# In the Court of Appeals of Georgia

A12A1347. JOHNSON et al. v. OMONDI et al.

RAY, Judge.

The parents of Shaquille Johnson sued Price Paul Omondi, M.D., and Southwest Emergency Physicians, P.C. (collectively "Omondi"), for professional malpractice after their son, Shaquille Johnson, died following treatment by Omondi in the emergency department at Phoebe Putney Memorial Hospital. Sheldon Johnson and Thelma Johnson, individually as Shaquille's surviving parents, and Thelma Johnson, as administratrix of his estate (collectively "the Johnsons"), appeal from the trial court's grant of Omondi's motion for summary judgment under OCGA § 51-1-29.5. For the reasons that follow, we affirm the entry of summary judgment to Omondi.

The standard for summary judgment is familiar and settled: "Summary judgment is warranted when any material fact is undisputed as shown by the pleadings and record evidence, and this fact entitles the moving party to judgment as a matter of law."[1] So, as we have explained before,

> [w]hen a defendant moves for summary judgment as to an element of the case for which the plaintiff . . . will bear the burden of proof at trial . . . the defendant may show that he is entitled to summary judgment either by affirmatively disproving that element of the case or by pointing to an absence of evidence in the record by which the plaintiff might carry the burden to prove that element.[2]

We review an award of summary judgment de novo, viewing the evidence in the record, as well as all inferences that might reasonably be drawn from that evidence, in the light most favorable to the nonmoving party.[3]

---

[1] (Citation omitted.) *Strength v. Lovett*, 311 Ga. App. 35, 39 (2) (714 SE2d 723) (2011).

[2] (Citation omitted.) Id.

[3] (Citation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

Viewed in that light, the following facts are undisputed.[4] Thelma Johnson took Shaquille to the emergency department at Phoebe Putney Memorial Hospital on December 29, 2007. Shaquille had undergone arthroscopic knee surgery, performed by Dr. James Mason, eight days earlier. Shaquille was complaining of pain on the left side of his chest that was worse in a recumbent position. Upon arrival at the emergency department, he was triaged by a nurse and taken to an exam room to be seen by Omondi, the emergency department physician. Omondi spent several minutes in the exam room with Shaquille and his mother, asked Shaquille's mother why she had brought him to the emergency department, and told them he was ordering a chest x-ray and an electrocardiogram (EKG). These tests were performed while Shaquille was in the emergency department. Omondi testified during his deposition that he reviewed the triage nurse's record and findings, inquired about past medical history and family history, including any past diagnoses of pulmonary embolism or pneumonia, and was aware of Shaquille's recent knee surgery and chief complaint.

---

[4] These facts are taken from the Plaintiffs' Response to the Defendants' Statement of Material Facts. Although the dissent admonishes us for "mimicking" the trial court's recitation of the facts and analysis, it is clear that the trial court's facts have also been taken from the Plaintiffs' Response to the Defendants' Statement of Material Facts, and these facts led both the trial court and this Court to the same conclusions based on the applicable law.

3

Although the parties disagree about some aspects of Omondi's examination, it is undisputed that Omondi noted in the record that Shaquille's presentation to the emergency department did not fit neatly into cardiac, pulmonary, or gastrointestinal etiologies and was difficult to catagorize. The medical records reflect that a physical exam was conducted of Shaquille, as well as exams of Shaquille's systems, including his pulmonary, cardiovascular, abdomen and flank, neurologic, dermatologic, lymphatic and vascular, psychiatric and mental status, and musculoskeletal conditions. After the chest x-ray was performed, Omondi interpreted it and found no evidence of an enlarged heart, pneumothorax, pneumonia, or skeletal injury. He also interpreted the EKG and determined it was normal, ruling out heart rhythm disturbances, heart attack, and pericarditis. Omondi specifically testified that the EKG was not suggestive of pulmonary embolism as the cause of the pain Shaquille experienced on the left side of his chest. Regarding pulmonary embolism, Omondi considered that Shaquille did not have shortness of breath, had normal vital signs, and had perfect pulse oximetry, which measures oxygenation of the blood. Omondi further considered that Shaquille responded positively to Toradol, a medication that was administered under Omondi's orders. Because the Toradol completely resolved Shaquille's pain, and because Toradol is an anti-inflammatory that would not treat

4

pain from a pulmonary embolism, Omondi concluded that this was further evidence that there was no blood clot in Shaquille's lungs.

Omondi concluded that Shaquille was suffering from pleurisy, and he prescribed Naprosyn, an anti-inflammatory medication for pain, and discharged Shaquille. The discharge nurse gave Shaquille's mother discharge instructions, including a verbal instruction to return to the emergency room if symptoms continued. Shaquille's mother testified by deposition that when Shaquille was discharged from the hospital, she was satisfied with the care he had received. Two weeks later, on January 13, 2008, Shaquille allegedly complained of chest pain and difficulty breathing, and he was transported by ambulance to Phoebe Putney Memorial Hospital, where he later died from a bilateral pulmonary embolism.

This case really does not involve a dispute regarding the relevant facts. The Johnsons agree that Omondi examined, treated, and provided care to Shaquille. Essentially what is disputed in this case, by opinion evidence, is the appropriateness of the care and the treatment provided to Shaquille in the emergency department on December 29, 2007. The Johnsons claim Shaquille's care and treatment deviated from the appropriate standard of care and was thus a proximate cause of Shaquille's death. Taken from the Plaintiffs' Statement of Material Facts as to Which Genuine Issues

5

Exist for Trial, and viewing the disputed facts in the light most favorable to the Johnsons as the non-moving party, the Johnsons and their experts contend that the history taken by Omondi, the physical exam he conducted, and his interpretation of the chest x-ray and EKG were all deviations from the standard of care. Furthermore, the Johnsons contend that Omondi's alleged failure to properly rule out a pulmonary embolism, order a chest CT scan, and order an ultrasound of Shaquille's surgical leg constituted medical negligence and are issues for the jury to decide. Given the circumstances of this case, we must disagree.

This case is governed by OCGA § 51-1-29.5, the emergency medical care statute that was enacted in 2005.[5] Under that statute,

> [i]n an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department . . . no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.[6]

---

[5] While the Johnsons argued below that OCGA § 51-1-29.5 did not apply because Shaquille's trip to the Emergency Department did not constitute an emergency, on appeal they have accepted the trial court's ruling that the emergency medical care statute applies.

[6] OCGA § 51-1-29.5 (c).

This statute clearly distinguishes the actions of emergency department physicians from other healthcare providers in negligence cases, including medical malpractice cases not involving emergency department care, by mandating (1) a higher evidentiary standard (clear and convincing evidence), and (2) a lower standard of care (gross negligence). The Supreme Court of Georgia has found this statute constitutional, specifically finding that

> [p]romoting affordable liability insurance for health care providers and hospitals, and thereby promoting the availability of quality health care services, are certainly legitimate legislative purposes. Furthermore, it is entirely logical to assume that emergency medical care provided in hospital emergency rooms is different from medical care provided in other settings, and that establishing a standard of care and a burden of proof that reduces the potential liability of the providers of such care will help achieve those legitimate legislative goals.[7]

The Supreme Court of Georgia went on to define "gross negligence":

> [G]ross negligence is the absence of even slight diligence, and slight diligence is defined . . . as that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. In other words, gross negligence has been defined as equivalent to the failure to exercise even a slight degree of care, or lack of diligence that even careless men are accustomed to exercise.[8]

---

[7] See *Gliemmo v. Cousineau*, 287 Ga. 7, 11-12 (3) (694 SE2d 75) (2010).

[8] (Citations and punctuation omitted.) Id. at 12-13 (4). See also OCGA § 51-1-4.

That Court has also defined "clear and convincing evidence" as "an intermediate standard of proof, greater than 'the preponderance of evidence,' but less than the 'beyond a reasonable doubt' standard applicable in criminal cases. . . ."[9] It "requires a greater quantum and a high quality of proof in plaintiff's favor"[10] and is "substantially higher than that generally applicable to civil actions."[11] Accordingly, the Johnsons are bound by the evidentiary standard and standard of care dictated by the emergency medical care statute. In order to reach a jury trial, they must demonstrate that a genuine issue of material fact existed not as to whether Omondi exercised ordinary care (e.g., that degree of care and skill exercised by the medical profession generally),[12] but, rather, they must show the existence of "clear and convincing" evidence that Omondi did not exercise even slight care.

---

[9] (Citations omitted.) *Clarke v. Cotton*, 263 Ga. 861, 861 (440 SE2d 165) (1994).

[10] (Citations and punctuation omitted.) *In re: Estate of Lyndell Burton*, 265 Ga. 122, 123 (453 SE2d 16) (1995).

[11] *Consolidated American Ins. Co. v. Spears*, 218 Ga. App. 478, 480 (1) (462 SE2d 160) (1995).

[12] Compare *Smith v. Finch*, 285 Ga. 709, 710-711 (1) (681 SE2d 147) (2009).

There is a paucity of case law on this statute. In fact, there is only one case applicable to the facts of the instant action.[13] In *Pottinger*, a patient filed a medical malpractice action against an emergency room physician, seeking to recover damages arising out of emergency medical care provided to him for a leg fracture incurred in a motorcycle accident. The physician moved for summary judgment, asserting she could not be held liable because there was no clear and convincing evidence that her actions in providing emergency medical care to the patient showed gross negligence, as required by OCGA § 51-1-29.5 (c). Specifically, the evidence showed that the physician ordered x-rays, then, relying on a radiologist's finding that the x-rays did not show a serious fracture, she discharged the patient without ordering an orthopedic consultation. The patient subsequently saw an orthopedic surgeon who found that he had a serious leg fracture requiring surgery. The fracture was shown on the emergency room x-rays. The trial court denied summary judgment to the emergency room physician, but we reversed, interpreting the evidentiary standard and standard of care in OCGA § 51-1-29.5 (c), and concluding that "there [was] no evidence, and certainly no clear and convincing evidence, by which a jury could reasonably conclude that [the emergency room physician] failed to exercise even slight care and

_____

[13] *Pottinger v. Smith*, 293 Ga. App. 626 (667 SE2d 659) (2008).

9

was therefore grossly negligent."[14] Because questions of negligence and diligence, even questions of gross negligence and slight diligence, may be resolved by the trial court in plain and indisputable cases, we found that the emergency room physician was entitled to summary judgment as a matter of law.[15] The same is true in the present case, and, contrary to the Johnsons' claim, the trial court did not err in interpreting and applying *Pottinger* to this case.

While the dissent argues that the circumstances in this case are similar to those found in *Knight v. Roberts*,[16] the dissent acknowledges that the emergency medical care statute was neither raised nor discussed in that case. Furthermore, the treating physician in *Knight* admitted he never considered a thoracic aneurysm or an aortic dissection, from which the patient ultimately died. In this case, however, Omondi not only considered a pulmonary embolism, but concluded that this was not the cause of

---

[14] Id. at 629.

[15] Id.; accord *Heard v. City of Villa Rica*, 306 Ga. App. 291, 295 (1) (701 SE2d 915) (2010) (finding that a coach was immune from liability because parents could not prove he was grossly negligent for a child's injuries).

[16] __ Ga. App. __ (Case Nos. A12A0740, A12A0741, A12A0770, decided July 3, 2012).

Shaquille's pain based on a number of tests and factors previously discussed in this opinion.

Applying the facts and the law to this case, we find that the trial court properly entered summary judgment in favor of Omondi. Although the Johnsons' loss of their young son is tragic, courts must follow the law as it applies to the case before them, regardless of the outcome.[17] While the Johnsons have introduced expert testimony in an attempt to create a genuine issue of material fact, they have failed to focus on the applicable standards under OCGA § 51-1-29.5 (c).[18] The Johnsons and the dissent

---

[17] The Johnsons cite a 1913 case for the proposition that whether an emergency medical care provider is guilty of gross negligence "must be judged in relation to the degree of potential injury" to the patient. *O'Dowd v. Newnham*, 13 Ga. App. 220 (80 SE 36) (1913). In *O'Dowd*, the Court held that a driver of an automobile is bound to use a degree of reasonable care proportionate to the danger of the instrumentality which he operates. Id. at 228. Not only is this case inapplicable to the present situation, but the emergency medical care statute fails to legislate such a distinction, and the law is clear that "the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence. Nor can it support an inference of gross negligence." (Citation and punctuation omitted.) *Wolfe v. Carter*, 314 Ga. App. 854, 859 (2) (b) (726 SE2d 122) (2012).

[18] Indeed, if an expert affidavit is all that is needed to preclude summary judgment, then OCGA § 51-1-29.5 would be rendered meaningless. To give the emergency medical care statute the meaning necessary to achieve its constitutionally valid purpose of "[p]romoting affordable liability insurance for health care providers and hospitals" and "the availability of quality health care services," see *Gliemmo*, supra at 11 (3), the actual facts of the case (indicating whether slight care was provided) must be paramount in determining whether a claimant will reach a jury. As

11

both focus on what Omondi did wrong, rather than on what he did right and whether he provided a "slight degree of care," which he clearly did in this case.[19] Contrary to the Johnsons' arguments, this case is appropriate for summary judgment because it is plain and undisputable that

> [e]ven assuming there was evidence sufficient to create a jury issue as to whether [Omondi's] actions were negligent, there is no evidence, and certainly no clear and convincing evidence, by which a jury could reasonably conclude that [Omondi] failed to exercise even slight care and was therefore grossly negligent.[20]

It is undisputed that Omondi was present in the exam room, inquired why Shaquille had been brought into the emergency department, spent several minutes with Shaquille and his mother, inquired about past medical history and family history, including any past diagnoses of pulmonary embolism or pneumonia, ordered a chest x-ray and EKG, personally interpreted the test results, and considered and discarded

---

Emory Healthcare, Inc. correctly notes in its amicus curiae brief, in order to carry out the Legislature's intent, the gross negligence standard must preclude liability for emergency medical care where slight care is provided, even if such care arguably could be deemed negligent under the ordinary negligence standard.

[19] While it is obvious that the dissent does not agree with the General Assembly's decision to mandate a lower standard of care and a higher evidentiary standard for emergency department physicians, it is not the duty of this Court to second guess the Legislature.

[20] *Pottinger*, supra at 629.

a number of medical diagnoses, including the possibility of a pulmonary embolism, based on a number of tests, symptoms, and Shaquille's responses to the medication he received while in the emergency room. These facts do not indicate that Omondi was grossly negligent in his treatment of Shaquille. In fact, they show quite the opposite.

While the Johnsons' experts criticized the care rendered to Shaquille, those experts never opined that Omondi failed to "exercise even a slight degree of care."[21] In addition, even if some of the Johnsons' allegations of negligence could somehow be construed as approaching gross negligence, any such allegations fall far short of providing evidence that is "substantially higher" than a preponderance of the evidence.[22] The facts in this case just are not sufficient to establish that Omondi acted

---

[21] Id. at 628. The Fulton DeKalb-Hospital Authority correctly notes in its amicus brief that even if the Johnsons' experts had used "the magic words" and opined that Omondi's conduct was "grossly negligent" or that his conduct did not constitute even "slight" diligence, the trial court would have been compelled to determine whether such an opinion met the stringent requirements for admissibility set forth in OCGA § 24-9-67.1. See *Morgan v. Horton*, 308 Ga. App. 192, 198 (3) (a) (707 SE2d 144) (2011) ("[a] mere conclusory expert opinion with respect to the existence of gross negligence does not create a jury issue; rather, there must be facts sufficient for a jury to find gross negligence.") (citation and punctuation omitted); accord *Heard*, supra at 294 (1).

[22] See *Consolidated American Ins. Co.*, supra at 480 (1).

13

with gross negligence. Because it is undisputable that the Johnsons cannot prove by clear and convincing evidence that Omondi failed to exercise even slight care in treating Shaquille, the trial court properly granted Omondi's motion for summary judgment.[23]

*Judgment affirmed. Andrews and Branch, JJ., concur. Doyle, P. J., and Boggs, J., concur in judgment only. Miller, P. J., and Phipps, P. J., dissent.*

---

[23] The dissent criticizes us for incorporating language used by the trial court in its ruling in this case, but if the trial court is correct, as we have so found, then the dissent's criticism is misplaced. It is not the origin of the language used in conveying this Court's ruling that is important, but the law and logic underlying the analysis. In this case, the trial court did an excellent job with its analysis, and we incorporated portions of the order that we found particularly compelling.

A12A1347. JOHNSON et al. v. OMONDI et al.

MILLER, Presiding Judge, dissenting.

I dissent from the majority's opinion because the record evidence presents a jury question as to whether the medical defendants were entitled to immunity under OCGA § 51-1-29.5 (c), and thus, the entry of summary judgment was erroneous.

OCGA § 51-1-29.5 (c) provides, in pertinent part, that

> [i]n an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department . . . no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

(Punctuation omitted.)

Here, the evidence presents a question of fact as to whether Dr. Omondi's actions showed gross negligence. Significantly, the Johnsons presented competent medical expert affidavits and testimony from two experienced emergency room

physicians,[1] who had explicitly set forth facts supporting their opinions as to how Dr. Omondi's actions failed to comport with the minimum standard of care that applied to emergency physicians under the circumstances; had opined that Dr. Omondi's treatment of Shaquille constituted gross negligence as a result of those failures; and, had reflected that Dr. Omondi's gross negligence and misdiagnosis were the proximate cause of Shaquille's death. Specifically, the medical experts stated that:

(1) Dr. Omondi's physical examination was incomplete and failed to integrate the key pieces of historical information that were available to him, which presented

<hr />

[1] Dr. Peter Rosen and Dr. Steven Gabaeff served as medical experts in this case. Dr. Rosen had been a licensed physician since 1962, and he was the author and editor of numerous textbooks on the subject of emergency medicine, including a text and reference book entitled, "Emergency Medicine: Concepts and Clinical Practice." Dr. Rosen had maintained teaching faculty privileges at Harvard University Medical School's teaching hospital; had maintained hospital staff privileges at several hospitals where he served as an emergency physician; had diagnosed the condition of pulmonary embolism hundreds, if not thousands, of times during his career as an emergency physician; and had taught medical students, interns, and residents how to properly consider, rule out, and diagnose the presence of a pulmonary embolism. Dr. Gabaeff had been an emergency physician for 35 years, and he had considered, ruled out, and diagnosed the condition of pulmonary embolism hundreds of times. Dr. Gabaeff had also been a faculty physician at the University of California Medical School in San Diego, and had taught medical students, interns, and residents on how to properly consider, rule out, and diagnose the pulmonary embolism condition. Based upon these qualifications, the trial court denied Dr. Omondi's motion to exclude the medical expert's testimony, and ruled that the medical experts were qualified to give expert opinion testimony in this case pursuant to OCGA § 24-9-67.1 (c).

a classic case of pulmonary embolism incidental to post-operative deep vein thrombosis ("DVT");

(2) Dr. Omondi erroneously interpreted the EKG results and failed to recognize the Q3 and T3 abnormalities in the EKG results, which evidenced a right ventricular hypertrophy and was a classic sign of pulmonary embolism;

(3) Dr. Omondi failed to order a CT scan of Shaquille's lungs, which was the necessary test to detect the existence of a pulmonary embolism;

(4) Dr. Omondi failed to perform a lung scan, D-dimer, or ultrasound to rule out a thrombi in Shaquille's lungs or in his surgical leg;

(5) Dr. Omondi failed to recognize the high risk history of Shaquille to develop DVT and pulmonary embolism conditions based upon his recent leg surgery and immobilization;

(6) Dr. Omondi erroneously interpreted the chest x-ray as being normal, despite the presence of an enlarged heart that rendered it abnormal;

(7) Dr. Omondi failed to recognize that Shaquille's pleuritic chest pain was a classic symptom of pulmonary embolism;

(8) Dr. Omondi's physical examination was grossly deficient, as evidenced by his erroneous notation that Shaquille's gait, strength, tone, reflexes, and range of

motion in his extremities were normal, which were impossible in light of Shaquille's recent leg surgery; and

(9) The manner in which Dr. Omondi purported to rule out a diagnosis of pulmonary embolism was grossly improper, egregious, and contrary to well-known and fundamental medical principles.

The medical experts opined that Dr. Omondi's failures amounted to gross deviations from the required standard of care and proximately caused Shaquille's death. A medical expert further attested that but for Dr. Omondi's misdiagnosis and mistreatment, Shaquille's pulmonary embolism condition could have been treated through anticoagulant therapy that more than likely would have saved Shaquille's life.

In addition to the evidence provided by the Johnsons' medical experts, Dr. Omondi himself acknowledged that he misinterpreted the EKG by failing to note the Q3 abnormality and that the left ventricular hypertrophy shown in the EKG was a condition that could reflect a pulmonary embolism. Dr. Omondi further acknowledged that a pulmonary embolism can not be identified on an x-ray, and that the best way to identify a pulmonary embolism is through a CT scan. Dr. Omondi testified that he could have ordered a CT scan, and that a CT scan is the only test that

4

is needed to diagnose a patient who may have a pulmonary embolism. Dr. Omondi expressed no opinion as to whether Shaquille's death would have been prevented if he had only ordered the CT scan, but he agreed that a pulmonary embolism can be fatal and would require admission to the hospital for treatment using anticoagulant therapy. The evidence showed, however, that Dr. Omondi discharged Shaquille from the emergency room with a final diagnosis of pleurisy, without performing a CT scan to detect a pulmonary embolism or to confirm whether a pulmonary embolism was the overall cause of the pleurisy symptom.

The foregoing evidence was certainly sufficient to present a jury question as to Dr. Omondi's alleged gross negligence in the instant case. The trial court had previously ruled that the Johnson's medical experts were qualified to give opinion testimony in this case, and thus, their testimony was admissible under OCGA § 24-9-67.1. The medical experts gave testimony regarding the standard of care based upon their knowledge of the customs and duties that apply to emergency room physicians under similar circumstances, and the medical experts further testified that Dr. Omondi's actions amounted to gross negligence under those standards. In doing so, the medical experts referenced specific facts showing the manner in which Dr. Omondi's actions departed from the standard of care. While it is recognized that "[a]

mere conclusory expert opinion with respect to the existence of gross negligence does not create a jury issue," see *Morgan v. Horton*, 308 Ga. App. 192, 198 (3) (a) (707 SE2d 144) (2011), the principle does not apply here since the medical experts' opinions were based upon sufficient facts for a jury to find gross negligence.

> [W]hen facts alleged as constituting gross negligence are such that there is room for difference of opinion between reasonable people as to whether or not negligence can be inferred, and if so[,] whether in degree the negligence amounts to gross negligence, the right to draw the inference is within the exclusive province of the jury.

(Citation and punctuation omitted.) *McFann v. Sky Warriors, Inc.*, 268 Ga. App. 750, 758 (4) (603 SE2d 7) (2004).

Nevertheless, the trial court and the majority opinion have failed to give due consideration to the medical expert evidence and opinions in reaching their erroneous conclusion that no genuine issues of fact exist for jury determination. The failure to consider all of the admissible evidence of record is improper and contravenes the longstanding principles that must be consistently applied when ruling upon a motion for summary judgment.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to

6

the nonmoving party, warrant judgment as a matter of law. . . . If, and only if, no disputed issue of material fact remains is the trial court authorized to grant summary judgment.

(Citations and punctuation omitted.) *Montgomery v. Barrow*, 286 Ga. 896, 898 (1) (692 SE2d 351) (2010). "Conflicts in the evidence are to be resolved by the jury." (Citation omitted.) *Aleman v. Sugarloaf Dialysis, LLC*, 312 Ga. App. 658, 660 (1) (719 SE2d 551) (2011).

More importantly,

[s]ummary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of § 9-11-56 (c) have been met. In our de novo review of the grant of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010). Although the majority opinion recites our mandatory standard of review, it is obvious that the majority opinion has failed to apply this standard in its analysis. Rather than conducting a de novo review of the evidence presented in the record as required, the majority opinion merely mimics the trial court's recitations of the facts and analysis. As appellate judges, we can not ignore conflicting evidence of record

7

in order to reach a particular result. The majority opinion's approach undermines the requirement that must be applied in summary judgment appeals to ensure that a party is not erroneously deprived of his right to a trial on the merits.

Notably, while both the trial court's order and the majority opinion purport to set forth undisputed facts based upon the Defendants' Statement of Material Facts and Plaintiffs' Responses thereto, they have misinterpreted the plaintiffs' responses and fail to acknowledge the material disputes raised by the evidence. For example, the majority opinion reflects that it is undisputed that Dr. Omondi "noted in the record that Shaquille's presentation to the emergency department did not fit neatly into cardiac, pulmonary, or gastrointestinal etiologies and was difficult to categorize." Although it is undisputed that Dr. Omondi noted his opinion in the medical record, Dr. Omondi's note is not dispositive in resolving the issue in this case. Significantly, there was contrary medical expert testimony stating that Shaquille presented to the emergency department with severe chest pain that was worse upon inspiration, "*which is a classic symptom of [p]ulmonary [e]mbolism*, particularly in a patient who had recently undergone knee surgery and had limited mobility" that would give rise to a suspicion of DVT leading to the development of a pulmonary embolism. (Emphasis supplied.) In light of the evidence reflecting that Shaquille's symptoms and history

8

presented a classic case of a pulmonary embolism, that Dr. Omondi had misinterpreted the results of the tests he had performed, and that Dr. Omondi had failed to perform the necessary CT scan to detect or rule out a pulmonary embolism, there was a genuine issue for jury determination as to whether Dr. Omondi had been grossly negligent in his treatment.

In addition, the trial court's order and the majority opinion only briefly acknowledge that the facts regarding Dr. Omondi's examination are disputed. Shaquille's mother, who was present during the examination, stated that Dr. Omondi "never laid hands on [Shaquille]" and never asked Shaquille any questions. Shaquille's mother claimed that Dr. Omondi had only communicated with her during their three-minute encounter in the ER. The medical experts pointed to Dr. Omondi's limited examination as being grossly deficient, and they stated that his lack of attentiveness to Shaquille's symptoms violated the standard of care and led to the misdiagnosis. This evidence is material to the consideration of the gross negligence claim and cannot be disregarded.

Likewise, I disagree with the majority opinion's analysis, to the extent that it improperly expands the gross negligence standard under OCGA § 51-1-29.5 (c). In this regard, the suggestion that immunity applies as long as some care is provided is

9

patently incorrect. In this context, the term "gross negligence" has the same meaning as the general definition provided under OCGA § 51-1-4. See *Gliemmo v. Cousineau*, 287 Ga. 7, 12-13 (4) (694 SE2d 75) (2010).

> Under OCGA § 51-1-4, gross negligence is the absence of even slight diligence, and slight diligence is defined in the Code section as "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." In other words, gross negligence has been defined as "equivalent to the failure to exercise even a slight degree of care", or "lack of the diligence that even careless men are accustomed to exercise."

(Citations and punctuation omitted.) Id., quoting *Pottinger v. Smith*, 293 Ga. App. 626, 628 (667 SE2d 659) (2008). This definition of gross negligence, however, does not require the entire absence of care or the provision of merely some degree of care. See *Caskey v. Underwood*, 89 Ga. App. 418, 422 (4) (79 SE2d 558) (1953); *Hennon v. Hardin*, 78 Ga. App. 81, 84 (50 SE2d 236) (1948). Indeed, this Court has previously ruled that "[i]t is . . . well settled that one may fail to exercise the whole degree of slight diligence and still be in the exercise of some care. Where this condition exists, gross negligence is present." (Citation and punctuation omitted.) *Caskey*, supra, 89 Ga. App. at 422 (4). In other words, "one may be guilty of gross

negligence and still be in the exercise of *some* degree of care." (Emphasis in original.) *Hennon*, supra, 78 Ga. App. at 84.

Furthermore, applying the clear and convincing evidence standard does not mandate summary adjudication of the gross negligence issue. The Supreme Court of Georgia has ruled that "although OCGA § 51-1-29.5 (c) raises the burden of proof in certain cases, it does not deprive [plaintiffs] of the right to a jury trial or any other fundamental right." (Citation and punctuation omitted.) *Gliemmo*, supra, 287 Ga. at 11 (3). In fact, the statute contemplates the right to a jury trial on the liability issue by expressly providing that "the court shall instruct *the jury* to consider, together with all other relevant matters," certain designated considerations.[2] (Emphasis supplied.)

---

[2] According to OCGA § 51-1-29.5 (d),

[i]n an action involving a health liability claim arising out of the provision of emergency medical care in a hospital emergency department . . . the court shall instruct *the jury* to consider, together with all other relevant matters:

(1) Whether the person providing care did or did not have the patient's medical history or was able or unable to obtain a full medical history, including the knowledge of preexisting medical conditions, allergies, and medications;

11

See OCGA § 51-1-29.5 (d). Contrary to the majority's erroneous suggestion, I do not disagree with the standards set forth in OCGA § 51-1-29.5. A proper resolution of this case does not require this Court to second guess the Legislature. Notably, the Legislature also enacted the provisions of subsection (d) of OCGA § 51-1-29.5, which provides direction for jury trials in cases where, as here, the evidence establishes a genuine dispute for trial. Although it is recognized that the court may solve the question of gross negligence as a matter of law in plain and indisputable cases, see *Pottinger*, supra, 293 Ga. App. at 629, the evidence in the instant case does not present a plain and indisputable case for summary resolution. Rather, as contemplated by OCGA § 51-1-29.5 (d), a jury must serve as the fact finder and resolve the evidentiary conflicts presented in this case.

---

(2) The presence or lack of a preexisting physician-patient relationship or health care provider-patient relationship;

(3) The circumstances constituting the emergency; and

(4) The circumstances surrounding the delivery of the emergency medical care.

(Emphasis supplied.)

12

Contrary to the majority's view, the decision in *Pottinger* does not definitively support the entry of summary judgment in the instant case. A careful review of the facts and evidence cited in *Pottinger* show that the case is distinguishable. In *Pottinger*, the physician who provided emergency medical care to the patient for a leg fracture complied with the applicable duty of care by ordering the proper diagnostic x-rays. See *Pottinger*, supra, 293 Ga. App. at 626, 629. The x-rays were interpreted by a radiologist, and the physician relied upon the radiologist's finding that the x-rays did not show a serious fracture. Id. at 629. The emergency room x-rays were later examined by an orthopedic surgeon, who observed a serious fracture that was not noted by the radiologist. Id. at 627. This Court held that under OCGA § 51-1-29.5, the physician was entitled to summary judgment in the medical malpractice lawsuit since there was no clear and convincing evidence by which a jury could reasonably conclude that the emergency room physician failed to exercise even slight care. Id. at 629.

Here, unlike in *Pottinger*, there is evidence indicating that Dr. Omondi failed to comply with the applicable duty of care since he did not order the proper diagnositic test, a CT scan, that was necessary to detect Shaquille's condition. Dr. Omondi acknowledged that a pulmonary embolism can not be identified on an x-ray,

13

and that the best way to identify a pulmonary embolism is through a CT scan, which he did not order. Dr. Omondi testified that a CT scan was available to him, and that his failure to order a CT scan was not due to any time limitations. A CT scan was not ordered simply because Dr. Omondi did not believe that a pulmonary embolism condition was indicated, which the medical experts explained was based upon his failures to properly assess and recognize the classic symptoms of the condition. Moreover, unlike in *Pottinger*, Dr. Omondi did not rely upon a radiologist's findings in his assessment; rather, he read and misinterpreted Shaquille's x-ray and EKG results himself. Dr. Omondi acknowledged that he failed to note the abnormality shown in the EKG results, which could have reflected a pulmonary embolism condition.

Notably, the circumstances in this case are similar to those found in this Court's recent decision of *Knight v. Roberts*, __ Ga. App. __, * 84-86 (1) (Case Nos. A12A0740, A12A0741, A12A0770, decided July 3, 2012), where we ruled that an emergency physician was not entitled to summary judgment in a malpractice lawsuit based upon evidence that he had failed to consider and obtain a CT scan to diagnose

14

the patient's aortic dissection condition.[3] Although the emergency physician had obtained a chest x-ray as a part of his examination of the patient, medical experts explained that a chest x-ray was not the proper diagnostic test to be used in order to rule out the patient's condition. Id. at 84 (1) (a). The experts further opined that the patient's subsequent death could have been prevented if the emergency physician had properly complied with the standard of care during his examination of the patient in the emergency room. Id. at 85 (1) (a).

In sum, I do not believe that a physician who renders treatment in an emergency room is afforded immunity under OCGA § 51-1-29.5 (c) as long as he performs some acts that purport to provide care. A physician's duty to comply with the standard of care governing the circumstances is not entirely eliminated simply because treatment is rendered in an emergency room. Patients who seek treatment in an emergency room setting are nonetheless entitled to receive competent medical

---

[3] I fully recognize that the element of causation was the primary issue presented and resolved in *Knight*, supra, __ Ga. App. at 83-86 (1) (a), (b), and the parties did not raise the issue of immunity under OCGA § 51-1-29.5 (c). Nevertheless, *Knight* highlights that emergency physicians who provide medical treatment to patients in the ER are not exempt from complying with the applicable standard of care, and their duty to order proper tests for the patient's diagnosis and treatment is crucial. Here, as in *Knight*, Dr. Omondi failed to order the required tests to diagnose Shaquille's classic symptoms, which allegedly deprived Shaquille of the ability to receive treatment that could have prevented his death.

care. In our review of the evidence in this case, we cannot simply disregard the medical experts' affidavits and testimony which clearly set forth the standard of care and the manners in which Dr. Omondi's treatment allegedly failed to meet the standard. Based upon this evidence, Dr. Omondi's decision to discharge Shaquille from the emergency room, without performing the required diagnostic tests to identify the source of his complaints and to rule out the possibility of a life-threatening condition, could be considered as gross negligence. Ultimately, the issue of Dr. Omondi's alleged gross negligence must be resolved by a jury after hearing the totality of the evidence and instructions to consider all relevant matters, including those designated under OCGA § 51-1-29.5 (d). In light of the record evidence in this case, summary judgment was not authorized.

I am authorized to state that Presiding Judge Phipps joins in this dissent.