**FIRST DIVISION
ELLINGTON, P. J.,
RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 21, 2013**

# In the Court of Appeals of Georgia

A13A1616. QUINNEY et al. v. PHOEBE PUTNEY MEMORIAL
    HOSPITAL, INC. et al.

Ray, Judge.

Douglas L. Quinney and his wife sued Phoebe Putney Memorial Hospital, Inc. and Phoebe Putney Health System, Inc. ("the hospital"), Southwestern Emergency Physicians, P.C. , Raymond E. Gutierrez, M.D., Elizabeth Kenja, R.N., and David Stalvey, R.N. (collectively referred to as "the defendants") asserting claims for professional negligence and for violations of the Federal Emergency Medical Treatment and Active Labor Act ("EMTALA") under 42 U.S.C § 1395dd, alleging that the defendants failed to provide Mr. Quinney with necessary medical treatment while he was in the emergency department of the hospital. The trial court granted summary judgment in favor of the defendants, finding that OCGA § 51-1-29.5

applied to the Quinneys' negligence claims and that the Quinneys failed to satisfy their evidentiary burden of showing gross negligence by clear and convincing evidence. The trial court further found that the hospital was entitled to judgment on the Quinneys' EMTALA claim. The Quinneys appeal, arguing that the trial court erred: (1) in finding that their claims arose out of the provision of "emergency medical care" as defined by OCGA § 51-1-29.5 (a) (5); or (2) if OCGA § 51-1-29.5 does apply, in finding that they failed to show gross negligence by clear and convincing evidence; and (3) in finding that they failed to show that the hospital violated the federal EMTALA statute. For the reasons that follow, we reverse the trial court's grant of summary judgment.

> A party is entitled to summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). On appeal from the grant of summary judgment, we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences. The party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact.

(Citations omitted.) *Ansley v. Raczka-Long*, 293 Ga. 138, 140 (2) (744 SE2d 55) (2013). Our review of the grant or denial of a motion for summary judgment is de

2

novo. *Woodcraft by Macdonald, Inc. v. Ga. Cas. and Surety Co.*, 293 Ga. 9, 10 (743 SE2d 373) (2013).

So viewed, the evidence shows on March 11, 2009, Mr. Quinney underwent surgery to have a spinal cord stimulator implant placed in his back to relieve a neuropathic condition in his feet. The surgery was performed by a neurosurgeon in Columbus, Georgia. Immediately after the surgical procedure, Mr. Quinney was discharged and allowed to go back to his home in Albany.

Five days later, in the early morning hours of March 16, 2009, Mr. Quinney awakened with severe pain in his back. When he got up and walked around in an attempt to alleviate the pain, he noticed that one of his legs was getting weak such that he could no longer stand, so he laid across an ottoman in his living room. During this time, Mr. Quinney told his wife that he could no longer feel his legs. As Mr. Quinney was screaming in pain, Mrs. Quinney called 911 and requested an ambulance. By the time the ambulance arrived, Mr. Quinney had lost the ability to move his right leg, and he had to be physically picked up and placed on a stretcher.

Mr. Quinney was transported by ambulance and arrived at the emergency department of the hospital in Albany at approximately 5:55 a.m. He was immediately triaged by nurse Stalvey, who classified Mr. Quinney as a "level two" patient,

3

meaning that there could be some serious complications if he did not receive immediate medical attention. Mr. Quinney told Stalvey that his pain was a "nine" on a scale of zero to ten, with ten being the worst. Although Mr. Quinney was screaming in pain during his initial examination, Stalvey was able to obtain Mr. Quinney's medical history, which included his history of neuropathy, as well as the fact that he had recently received a spinal cord stimulator implant.

At approximately 6:09 a.m., Mr. Quinney was examined by Dr. Gutierrez. Dr. Gutierrez noted that Mr. Quinney had presented to the emergency room with severe pain in his back, and Dr. Gutierrez further noted that Mr. Quinney had recently undergone surgery to implant the spinal cord stimulator. Dr. Gutierrez performed a physical examination on Mr. Quinney, as well as a general neurologic examination to evaluate his alertness, his orientation to person, place, and time, his cranial nerve responses, and his motor deficits. Although Dr. Guiterriez's differential diagnosis included the possibilities of a spinal canal abscess or a spinal canal hematoma,[1] Dr. Gutierrez never performed a complete neurologic examination of Mr. Quinney, which would have included a test for deep tendon reflexes, a neurological sensory exam, and

---

[1] Both of these conditions would constitute an emergency because they can cause spinal cord compression, which can lead to irreversible paralysis.

4

tests to determine if Mr. Quinney had the ability to ambulate.[2] Instead, Dr. Gutierrez ordered a CT scan of Mr. Quinney's spine.

During the CT scan, Mr. Quinney could not lie on his back and had to lie in a different position for the procedure. After the CT scan was performed, the results were interpreted by a radiologist.[3] The radiologist found no evidence of an abscess or any abnormal fluid collection at the operative site along Mr. Quinney's spine, and his impression of the area was consistent with a recent neurostimulator implant. The radiologist's report was made available to Dr. Gutierrez at 8:46 a.m.

Importantly, Dr. Gutierrez was unaware that Mr. Quinney could not lie on his back for the CT scan, even though it was clearly noted in the medical records. Dr. Gutierrez testified at his deposition that he did not know if this fact would have changed his mind about the results of the CT scan.

At 8:55 a.m., Dr. Gutierrez re-examined Mr. Quinney and noted that he remained symptomatic. Despite this fact, there is no evidence in the medical records to indicate that Dr. Gutierrez performed any more physical or neurological

---

[2] Even though these examinations were not performed, Dr. Gutierrez determined that Mr. Quinney had "no motor deficit."

[3] The radiologist was not named as a defendant in this case.

5

examinations of Mr. Quinney. Based on his initial examination of Mr. Quinney and the results of the CT scan, Dr. Gutierrez removed the possibilities of a spinal canal abscess and a spinal canal hematoma from his differential diagnosis.

Dr. Gutierrez called the neurosurgeon at the medical center in Columbus who had performed the spinal cord stimulator implant surgery to discuss the details of Mr. Quinney's presentation to the emergency room. After Dr. Guiterriez informed the neurosurgeon that Mr. Quinney's general neurological examination and CT scan results were both normal, the neurosurgeon agreed to have Mr. Quinney transferred to him at the medical center in Columbus for further evaluation and treatment. At 9:23 a.m., Dr. Gutierrez ordered Mr. Quinney's transfer to the medical center in Columbus.

After nurse Stalvey went off duty at 7:00 a.m., nurse Kenja was assigned to monitor Mr. Quinney and to attend to his care during the remainder of his stay in the emergency room. Mr. Quinney had been given several doses of pain medications throughout his stay at the emergency room, with little or no effect. Although Mr. Quinney remained symptomatic, the evidence shows that both Stalvey and Kenja failed to perform any neurologic assessments of Mr. Quinney. Mr. Quinney's vital

6

signs, including the severity of his pain, were worse at the time of his discharge than they were at the time of his admission into the emergency room.

Dr. Gutierrez's final diagnosis for Mr. Quinney was "back pain, status post back surgery." Around 12:30 p.m., approximately three hours after the patient transfer order was entered, Mr. Quinney was discharged from the emergency room and transported by ambulance to the medical center in Columbus. Upon his arrival at the medical center at approximately 3:00 p.m., Mr. Quinney was irreversibly paralyzed from a spinal cord compression caused by an expanding spinal canal hematoma.

1. In granting summary judgment to the defendants, the trial court found that the Quinneys' negligence claims arose out of the provision of emergency medical care and were therefore subject to the higher evidentiary standard (clear and convincing evidence) and the lower standard of care (gross negligence) mandated by OCGA § 51-1-29.5. The Quinneys contend that the trial court erred in finding that this statute applied to their negligence claims because the treatment Mr. Quinney received was not emergency medical care. We disagree.

OCGA § 51-1-29.5 (c) provides, in pertinent part:

[i]n an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency

7

department . . . no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (a) (5) defines "[e]mergency medical care" as:

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

The Quinneys argue that OCGA § 51-1-29.5 does not apply to their claims because Mr. Quinney was wrongfully treated as a medically "stable" patient by the defendants and that he did not receive "bona fide emergency services" while in the emergency room. However, the record clearly shows that when the defendants began their care of Mr. Quinney, they were providing emergency medical care as defined by OCGA § 51-1-29.5 (a) (5).

When Mr. Quinney presented to the emergency room, he was experiencing a medical condition with acute symptoms of sufficient severity, including excruciating pain in the area of his spine and the inability to walk, such that the absence of immediate medical attention could reasonably be expected to result in placing his health in serious jeopardy. This expectation is evidenced by the following facts: he was triaged with an acuity level of two; within minutes of his arrival, Dr. Gutierrez had examined him and ordered the administration of multiple pain medications and diagnostic tests; and Dr. Gutierrez's differential diagnosis included the possibilities of a spinal canal abscess or a spinal canal hematoma. Moreover, Mr. Quinney remained symptomatic throughout the entire time he was being treated in the emergency room and, in fact, his vital signs and pain levels had worsened by the time he was discharged and transported by ambulance to the medical center in Columbus.

We note that the Quinneys' negligence claims, as well as expert opinion evidence upon which they rely, indicate that Mr. Quinney had an emergency medical condition and that the defendants were grossly negligent in failing to properly diagnose and treat it. Under the facts of this case, the services that the defendants provided to Mr. Quinney, although alleged to be deficient, would constitute "emergency medical services" until such time as Mr. Quinney was "stabilized *and* .

9

. . capable of receiving medical treatment as a nonemergency patient." (Emphasis supplied.) OCGA § 51-1-29.5 (a) (5). The Quinneys have not shown that Mr. Quinney was ever capable of receiving medical treatment as a nonemergency patient. In fact, the Quinneys have shown just the opposite; that is, that emergency medical services were necessary because his health was in serious jeopardy.

Accordingly, we find that the services rendered by the defendants constituted emergency medical care as it is defined by OCGA § 51-1-29.5 (a) (5) and that the higher evidentiary burden of OCGA § 51-1-29.5 (c) applies to the Quinneys' negligence claims in this case.

2. The Quinneys contend that if OCGA § 51-1-29.5 does apply, the trial court erred in finding that they failed to meet the evidentiary threshold of showing gross negligence by clear and convincing evidence as required by OCGA § 51-1-29.5 (c). We agree.

For the purposes of OCGA § 51-1-29.5 (c),

gross negligence is the absence of even slight diligence, and slight diligence is . . . that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. In other words, gross negligence [is] . . . equivalent to the failure to exercise even a slight degree of care, or lack of the diligence that even careless men are accustomed to exercise.

10

(Citations and punctuation omitted.) *Gliemmo v. Cousineau*, 287 Ga. 7, 12-13 (4) (694 SE2d 75) (2010).

However, the application of these definitions in the context of emergency room health care liability claims has proven to be quite problematic, because such claims necessarily involve a departure from accepted standards of medical care. See OCGA § 51-1-29.5 (a) (9). The practice of medicine requires years of professional training and specialized education, and what conduct would constitute "slight diligence" or a "slight degree of care" on the part of a physician or other health care provider in diagnosing or treating a patient requires expert witness testimony rather than a juror simply relying upon his or her own experiences. See generally *Johnson v. Omondi*, ___ Ga. ___ (Case No. S13G0553, decided November 14, 2013) (Blackwell, J., concurring).

The facts in *Johnson v. Omondi*, 318 Ga. App. 787 (736 SE2d 129) (2012), which was recently reversed in *Johnson v. Omondi*, ___ Ga. ___, are instructive. In that case, Johnson had undergone arthroscopic knee surgery a week before he presented to the emergency room with pain in the left side of his chest. *Johnson*, 318 Ga. App. at 787. He was examined by Dr. Omondi, the emergency room physician, who considered several possible conditions in his differential diagnosis, including

11

pulmonary embolism. Id. at 787-788. Dr. Omondi performed a variety of examinations of Johnson's systems, which included assessments of his pulmonary, cardiovascular, neurologic, lymphatic, and musculoskeletal conditions. Id. at 787. Dr. Omondi also ordered medications, an electrocardiogram ("EKG"), and a chest X-ray. He interpreted the results of the X-ray and found no evidence of pneumonia, pneumothorax, skeletal injury, or an enlarged heart. Dr. Omondi interpreted the results of the EKG and determined that there was no evidence of heart rhythm disturbances, heart attack, or pericarditis. He also determined that the EKG results were not suggestive of pulmonary embolism, and he further considered such factors as Johnson's normal breathing, normal vital signs, and normal blood oxygenation. Lastly, Dr. Omondi noted that Toradol, an anti-inflammatory medication that had been administered under his orders, had completely resolved Johnson's pain. Because Toradol would not treat pain from a pulmonary embolism, he concluded that this was further evidence that Johnson did not have a blood clot in his lungs. Based on all of these findings, Dr. Omondi excluded pulmonary embolism from his differential diagnosis. Ultimately, Dr. Omondi diagnosed Johnson with pleurisy, gave him a prescription for anti-inflammatory medication, and discharged him from the hospital. Two weeks later, Johnson died from a bilateral pulmonary embolism. Id. at 789. In

12

affirming summary judgment for Dr. Omondi, we found that the plaintiffs had not presented clear and convincing evidence that Dr. Omondi had failed to exercise even slight care in treating Johnson, and therefore that they could not show gross negligence. Id. at 794.

In reversing our decision, our Supreme Court in *Johnson v. Omondi*, ___ Ga. ___, found that the plaintiffs had presented expert testimony to show that Dr. Omondi had deviated from accepted standards of medical care (1) when he relied on the above facts to exclude pulmonary embolism, and (2) when he failed to administer a CT scan or a lung scan. Given this evidence, our Supreme Court held that "a reasonable jury could find [ ] by clear and convincing evidence, that in addressing [Johnson's] symptoms, Dr. Omondi acted with gross negligence, i.e., that he lacked the diligence that even careless men are accustomed to exercise." (Citations and punctuation omitted.) Id. Thus, it appears that in the context of a motion for summary judgment, the burden of showing gross negligence (or lack of slight diligence) for the purposes of OCGA § 51-1-29.5 may in some cases be satisfied through the opinion testimony of a qualified expert.

In this case, the Quinneys presented the expert affidavit of Alan E. Jones, M.D. to show that, with regard to Mr. Quinney's treatment, the defendants did not meet the

13

accepted standards of care of the medical and nursing professions, in general, under like conditions and similar circumstances.[4]

Dr. Jones opined that the following facts demonstrate clear and convincing evidence that the defendants were grossly negligent in failing to properly diagnose and treat Mr. Quinney. Mr. Quinney presented to the emergency room with classic symptoms of a spinal canal hematoma or a spinal canal abscess, either of which can cause spinal cord compression. Spinal cord compression can be a progressive condition that causes severe pain at the site of compression and neurological deficits below the level of the compression. Such deficits may include, inter alia, the loss of sensation, the loss of the ability to determine the position of a body part, the loss of motor function of minor and major muscle groups, and the loss of tendon reflexes. Dr. Gutierrez failed to obtain the relevant history that Mr. Quinney, before arriving at the emergency room, had lost the ability to feel his right leg, as well as his ability to stand. Although Dr. Gutierrez noted in his records that Mr. Quinney had no motor deficits, he did not indicate what muscle groups he checked, and at no time did he perform a complete neurological examination of Mr. Quinney to determine whether

---

[4] No argument has been presented on appeal regarding Dr. Jones's competency to testify as to these standards under OCGA § 24-9-67.1.

he had any of the other deficits. A complete neurological exam would have required Dr. Gutierrez to perform deep tendon reflexes, a complete sensory exam, and a proprioception exam (an exam to assess a person's ability to determine the position of a body part). The neurological deficits indicating a spinal compression are also progressive, and complete neurological examinations are required to be repeated at regular intervals to determine the onset and progression of a spinal cord compression. Although Dr. Gutierrez had ordered a CT scan of Mr. Quinney's spine to determine the presence of an abscess, he failed to review the subsequent medical records which indicated that Mr. Quinney was unable to lie in the proper position during the CT scan. The fact that Mr. Quinney's severe back pain did not decrease and instead increased after he had been administered massive doses of pain medications should have alerted Dr. Gutierrez that Mr. Quinney had a serious condition affecting his spinal canal. Under such circumstances, he should have performed further physical examinations, neurological examinations, and diagnostic testing of Mr. Quinney, but he did not do so. Lastly, despite Mr. Quinney's history and symptoms, nurses Stalvey and Kenja never performed any physical assessments of Mr. Quinney beyond the taking of his vital signs, and at no time did they perform a basic nursing neurological evaluation of Mr. Quinney.

In considering the above evidence, we are cognizant of the fact that Dr. Gutierrez had ordered a CT scan to check for the presence of a spinal canal abscess, and that he had relied on the radiologist's report to exclude a spinal canal abscess or a spinal canal hematoma as possible causes of Mr. Quinney's back pain. A similar factual scenario was presented in *Pottinger v. Smith*, 293 Ga. App. 626 (667 SE2d 659) (2008).

In *Pottinger*, we reversed the trial court's denial of an emergency room physician's motion for summary judgment because the undisputed evidence showed that the physician had ordered the diagnostic measure appropriate to the symptoms the plaintiff presented, i.e., an X-ray, and then relied the radiologist's report[5] when determining the course of treatment. We held that, under those circumstances, a reasonable jury would not be able to find that the physician "failed to exercise even slight care and was therefore grossly negligent." Id. at 629.[6] However, the present case has additional facts that make it distinguishable from *Pottinger*.

---

[5] The radiologist's findings were later determined to be incorrect.

[6] Our Supreme Court has embraced our holding in *Pottinger*. See *Johnson*, ___ Ga. ___.

Here, at the time he relied upon the radiologist's report, facts were made available to Dr. Gutierrez that called into question the reliability of the CT scan results. Specifically, Mr. Quinney could not lie in the proper position for the procedure, and Dr. Gutierrez failed to note this fact despite that it was clearly stated in the CT scan report. As Dr. Gutierrez could not state whether this fact would have changed his mind about the results of the CT scan, an inference could be made that, had he simply reviewed the medical records which indicated this fact, he would have been required to consult with the radiologist or a neurosurgeon before relying on the results of the CT scan. He did not do so. Indeed, the Quinneys' expert pointed to these facts as additional clear and convincing evidence that Dr. Gutierrez had deviated from the accepted standards of medical care and was therefore grossly negligent in excluding spinal canal hematoma from his differential diagnosis.

As to the motion for summary judgment, we are required to construe the evidence most favorably towards the Quinneys, giving them the benefit of all reasonable doubts and possible inferences. *Ansley*, supra. Furthermore, the issue of whether evidence meets the required standard of being "clear and convincing" is generally a question of fact for the jury. *Johnson v. Omondi*, ___ Ga. ___. Under the facts of this case, we cannot say as a matter of law that a reasonable jury would be

17

unable to find by clear and convincing evidence that the defendants were grossly negligent. Id. Accordingly, it was error for the trial court to grant the defendants' motion for summary judgment with regard to the Quinneys' negligence claims.

3. The Quinneys also contend that the trial court erred in granting summary judgment in favor of the hospital on the EMTALA claim. We agree.

EMTALA, which is also referred to as the "Anti-Patient Dumping Act," is codified at 42 U.S.C.A. § 1395dd. EMTALA imposes two duties on hospitals. First, when an individual comes to a hospital's emergency department requesting examination and treatment for a medical condition, the hospital is required to provide an appropriate medical screening examination within its capability to determine whether an emergency medical condition exists.[7] 42 U.S.C.A. § 1395dd (a). Second, if the hospital determines that an emergency medical condition exists, the hospital must provide *further medical examination and treatment* of the individual so as "to stabilize"[8] his or her condition or arrange for a transfer of the individual to another

---

[7] EMTALA's definition of "emergency medical condition" is provided at 42 U.S.C.A. § 1395dd (e) (1) (A), and it is substantially similar to the definition provided in Georgia's emergency room statute under OCGA § 51-1-29.5 (a) (5).

[8] As used in EMTALA, the term "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or

18

medical facility, within certain parameters. 42 U.S.C.A. § 1395dd (b) (1). A hospital may not transfer an individual unless his or her condition has stabilized, absent certain defined exceptions.[9] 42 U.S.C.A. § 1395dd (c) (1). If a hospital violates any of these provisions, EMTALA allows an injured party to "obtain those damages available for personal injury under the law of the State in which the hospital is located." 42 U.S.C.A. § 1395dd (d) (2) (A).

In their EMTALA claim, the Quinneys do not allege that the hospital failed to provide him with its standard medical screening when he presented to the emergency department. Rather, the Quinneys' EMTALA claim is based on the hospital's failure to provide further medical treatment to stabilize Mr. Quinney with regard to his emergency medical condition before transferring him to another hospital.[10]

_____

occur during the transfer of the individual from a facility[.]" 42 U.S.C.A. § 1395dd (e) (3) (A).

[9] The statute permits a hospital to transfer or discharge a patient whose condition has not stabilized when (1) the patient requests the transfer in writing after being informed of the hospital's obligations under the statute, or (2) a physician certifies that the medical benefits of treatment at another facility outweigh the increased risks to the individual. See 42 U.S.C.A. § 1395dd (c) (1). Neither of these circumstances is present in this case.

[10] When an EMTALA claim against a hospital is based on the failure to provide an appropriate medical screening, the plaintiff must show that the hospital treated him differently than other patients with similar conditions. See *Bryant v. John D.*

19

As noted in Divisions 1 and 2 of this opinion, there is sufficient evidence in the record to show that Mr. Quinney presented to the hospital's emergency department with an emergency medical condition. Furthermore, there is sufficient evidence to show that Mr. Quinney was discharged and transferred in an unstable condition. The hospital argues, however, that it "had no notice nor any actual knowledge of an emergency condition" and, therefore, it can not be liable for failing to stabilize an unknown emergency condition prior to transfer. However, this argument lacks merit.

42 U.S.C.A. § 1395dd (e) (1) (A) (i) - (iii) defines an "emergency medical condition" as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . placing the health of the individual . . . in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part[.]

Here, there is sufficient evidence for the jury to find that the hospital, through its agents, was aware that Mr. Quinney was experiencing a medical condition that

*Archbold Memorial Hosp.*, No. 6:05-CV-11 (II) (B) (M. D. Ga. May 23, 2006). However, such a showing is not required for an EMTALA claim based on a hospital's failure to stabilize an emergency medical condition. See *Morgan v. North Miss. Med. Center, Inc.*, 403 F.Supp.2d 1115, 1125-1128 (II) (C) (3) and (4) (S.D. Ala. 2005).

20

manifested itself by acute symptoms of severe pain in the area of his spine and that the medical condition had resulted in his inability to ambulate. Moreover, a jury could also find that the hospital was aware that Mr. Quinney's condition was more than just post-operative discomfort, as evidenced by the fact that the massive doses of pain medications that had been administered to Mr. Quinney had little or no effect. In fact, Mr. Quinney's pain had increased to its highest level immediately prior to transfer. Even assuming that the hospital was unaware of the specific cause of his pain and inability to ambulate, there is sufficient evidence to allow a jury to decide whether it possessed knowledge of an emergency medical condition, as defined by 42 U.S.C.A. § 1395dd (e) (1), which would trigger the EMTALA requirement that the hospital provide "further medical examination and such treatment as may be required to stabilize [this] condition" prior to transfer. 42 U.S.C.A. § 1395dd (b) (1) (A) and (c) (1). Accordingly, the trial court erred in granting summary judgment to the hospital on the EMTALA claim.[11]

---

[11] We recognize that claims under OCGA § 51-1-29.5 require clear and convincing evidence of gross negligence. However, EMTALA does not appear to provide any such evidentiary burden. Therefore, we note, without expressly holding, that EMTALA could authorize a finding of liability without any finding of gross negligence on the part of the hospital. The Quinneys' theory of liability is based on an alleged violation of 42 U.S.C.A. § 1395dd (b), and such a claim cannot be construed as a negligence or a malpractice claim. See *Morgan*, supra at 1130-1131 (II) (C) (4).

For the above reasons, the trial court's grant of summary judgment to the defendants must be reversed.

*Judgment reversed. Ellington, P. J., and Branch, J., concur.*