**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**August 13, 2024**

# In the Court of Appeals of Georgia

A24A0704. ESTATE OF TOMLINSON et al. v. HOUSTON HEALTHCARE.

BARNES, Presiding Judge.

The Estate of Minnie Lee Tomlinson, by and through its executrix, Cynthia Gouge Morrison, (the "Estate") sued Houston Healthcare (the "Hospital"), alleging that when Tomlinson arrived at the Hospital's emergency department in an unstable emergency medical condition resulting from her chronic kidney disease, the Hospital failed to properly screen, stabilize, and admit her as an inpatient or transport her to another medical facility for treatment. The Estate asserted claims against the Hospital for alleged violations of the federal Emergency Medical Treatment and Labor Act ("EMTALA"), 42 USCA § 1395dd, negligence, and failure to maintain medical records. The Hospital filed a motion to dismiss, which the trial court granted. The

trial court dismissed the Estate's EMTALA and negligence claims for failure to file an expert affidavit pursuant to OCGA § 9-11-9.1. The trial court dismissed the Estate's claim for failure to maintain medical records on the ground that no such cause of action exists under Georgia law. The Estate now appeals from the dismissal order. For the reasons discussed below, the Estate was not required to support one of its alleged EMTALA claims – a claim for failure to provide an appropriate medical screening examination – with an OCGA § 9-11-9.1 expert affidavit, and we reverse the dismissal of that claim. We affirm the dismissal of the Estate's remaining EMTALA, negligence, and failure-to-maintain-medical-records claims.

On appeal from a trial court's ruling on a motion to dismiss, our review is de novo, and we "accept the allegations of fact that appear in the complaint and view those allegations in the light most favorable to the plaintiff." (Citation and punctuation omitted.) *Osprey Cove Real Estate v. Towerview Constr.*, 343 Ga. App. 436, 437 (1) (808 SE2d 425) (2017). So viewed, the Estate's complaint alleged as follows.

On March 19, 2021, Tomlinson was transported by ambulance to the Hospital's emergency department. Upon her arrival there, Tomlinson, who was 99 years old and had chronic kidney disease, presented with severe pain, faintness, and dizziness. The

2

Hospital, however, did not treat Tomlinson the same as other similarly situated patients. Although Tomlinson faced a life-threatening emergency, the Hospital did not perform a urinalysis or blood work on her, did not closely monitor her vital signs, and did not admit her as an inpatient. Instead, later that same day the Hospital transported Tomlinson by ambulance back to her house, where she was left "alone, unable to walk, unable to go to the bathroom, and without a caregiver." Tomlinson died on April 12, 2021.

Tomlinson's Estate, by and through its executrix, thereafter commenced the present suit against the Hospital, alleging that the Hospital violated EMTALA by failing to provide Tomlinson with an appropriate medical screening examination upon her arrival in the emergency department and by failing to stabilize her emergency medical condition before transferring her out of that department. The Estate also asserted a claim for negligence based on the Hospital's alleged failure to properly test and treat Tomlinson and its decision to transport her back to her house and leave her there alone. Lastly, the Estate asserted a claim for "failure to maintain medical records" based on the Hospital's alleged failure to maintain or provide Tomlinson's

medical records from the emergency department to the Estate's executrix. The Estate did not include an expert affidavit with its complaint.

The Hospital filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted. The Hospital argued that the Estate's EMTALA and negligence claims were claims for professional malpractice that required the submission of an expert affidavit with the complaint in accordance with OCGA § 9-11-9.1. The Hospital also argued that the Estate did not state a claim for failure to maintain medical records because Georgia does not recognize such a cause of action.

The trial court granted the Hospital's motion to dismiss. The trial court determined that the Estate's EMTALA claims were professional malpractice claims subject to the OCGA § 9-11-9.1 expert affidavit requirement and that federal law did not preempt that requirement. The trial court also determined that the Estate's negligence claims were claims for professional malpractice requiring an expert affidavit, and that the Estate's claim for failure to maintain medical records was not a cognizable cause of action. This appeal followed.

1. *The Estate's EMTALA claims.* The Estate contends that the trial court erred in dismissing its EMTALA claims for failure to file an OCGA § 9-11-9.1 expert

4

affidavit with its complaint. According to the Estate, the expert affidavit requirement mandated by OCGA § 9-11-9.1 does not apply to EMTALA claims because claims under that federal statute are not state professional malpractice claims. The Estate further argues that even if EMTALA claims can be characterized as state professional malpractice claims that fall within the ambit of OCGA § 9-11-9.1, the affidavit requirement is preempted by federal law. We will address these arguments each in turn.

(a) *Whether the OCGA § 9-11-9.1 Expert Affidavit Requirement Applies to the Estate's EMTALA Claims.* "Even where a claim is governed by substantive federal law, a state may apply its own procedural rules in its own courts, if those procedures do not defeat the objectives of the federal law." *Simmons Co. v. Deutsche Fin. Svcs. Corp.*, 243 Ga. App. 85, 87 (1) (532 SE2d 436) (2000). OCGA § 9-11-9.1 is a procedural rather than substantive law. *Nathans v. Diamond*, 282 Ga. 804, 808-809 (2) (654 SE2d 121) (2007). "OCGA § 9-11-9.1 imposes an initial pleading requirement on the plaintiff in a professional malpractice action, and a motion to dismiss based upon the lack of expert affidavit is one for failure to state a claim under OCGA §

9-11-12 (b) (6)." (Citations and punctuation omitted.) *Zephaniah v. Ga. Clinic*, 350 Ga. App. 408, 410 (829 SE2d 448) (2019).

Pursuant to OCGA § 9-11-9.1 (a), a plaintiff who brings a claim alleging professional negligence against a "professional licensed by the State of Georgia and listed in subsection (g) of this Code section . . . [or] [a]ny licensed health care facility alleged to be liable based upon the action or inaction of a health care professional licensed by the State of Georgia and listed in subjection (g) of this Code Section," must file an expert affidavit with his or her complaint.[1] See *Minnix v. Dept. of Transp.*, 272 Ga. 566, 567 (533 SE2d 75) (2000) (explaining that the expert affidavit requirement applies to a hospital where its "liability is premised on the action or inaction of a licensed health care professional listed in OCGA § 9-11-9.1 [g]"). Among

---

[1] OCGA § 9-11-9.1 (a) provides in relevant part:
     In any action for damages alleging professional malpractice against . . . [a] professional licensed by the State of Georgia and listed in subsection (g) of this Code section . . . or . . . [a]ny licensed health care facility alleged to be liable based upon the action or inaction of a health care professional licensed by the State of Georgia and listed in subsection (g) of this Code section, the plaintiff shall be required to file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim.
OCGA § 9-11-9.1 (a) (1), (3).

the professionals listed in OCGA § 9-11-9.1 (g) are medical doctors, physicians' assistants, and nurses. See OCGA § 9-11-9.1 (g) (11), (12), (18). The affidavit submitted with the complaint must be by "an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim." OCGA § 9-11-9.1 (a). Failure to comply with the expert affidavit requirement subjects a professional malpractice claim to dismissal. *Zephaniah*, 350 Ga. App. at 413 (2).

The "determinative factor" regarding whether a claim is for professional malpractice "is the existence or absence of allegations that the . . . professional has rendered negligent professional services." (Citation and punctuation omitted.) *Merritts v. North Ga. Veterinary Referral Practice*, 366 Ga. App. 756, 760 (1) (884 SE2d 135) (2023). "A professional negligence claim calls into question the conduct of the professional in his area of expertise," while "[a]dministrative, clerical, or routine acts demanding no special expertise fall in the realm of simple negligence." (Citation and punctuation omitted.) *Dodge County Hosp. Auth.*, 366 Ga. App. at 4. "[W]hen the failure to do a thing, or the negligent doing of it, is proved by reliance upon a general standard of care or by rules of procedure used by others competently performing the

7

same service, it is a professional act or practice." (Citation and punctuation omitted.) *Merritts*, 366 Ga. App. at 760 (1). See *Brown v. Tift Health Care*, 279 Ga. App. 164, 166 (630 SE2d 788) (2006) (noting that "a § 9-11-9.1 affidavit is required when the issue is the defendant's compliance with a professional standard of conduct"). And in the medical context, professional judgments are those "decisions which normally require the evaluation of the medical condition of a particular patient and, therefore, the application of professional knowledge, skill, and experience." (Citations and punctuation omitted.) *Ziglar v. St. Joseph's/Candler Health System*, 341 Ga. App. 371, 375 (800 SE2d 395) (2017).

In determining whether the expert affidavit requirement imposed by OCGA § 9-11-9.1 applies, "the plaintiff's characterization of her claims in her complaint does not control." *Merritts*, 366 Ga. App. at 760 (1). And application of the affidavit requirement is not limited to causes of action expressly for professional malpractice. See, e.g., *Hobbs v. Great Expressions Dental Centers of Ga.*, 337 Ga. App. 248, 248 (786 SE2d 897) (2016) (explaining that "OCGA § 9–11–9.1 (a) applies to any action for damages alleging professional malpractice, based on the failure to perform professional services in accordance with the applicable standard of care, including breach of

8

contract claims") (citation and punctuation omitted). We look to the substance of a claim to determine if OCGA § 9-11-9.1 (a) is applicable, see id. at 248-249, and the question whether a complaint sounds in professional negligence is for the court to decide. *Dodge County Hosp. Auth.*, 366 Ga. App. at 4.

Guided by this statutory framework, we turn to the Estate's EMTALA claims against the Hospital to determine whether they sound in professional negligence so as to require the filing of an expert affidavit under OCGA § 9-11-9.1 (a).

> EMTALA, which is also referred to as the "Anti–Patient Dumping Act," is codified at 42 USCA § 1395dd. EMTALA imposes two duties on hospitals. First, when an individual comes to a hospital's emergency department requesting examination and treatment for a medical condition, the hospital is required to provide an appropriate medical screening examination within its capability to determine whether an emergency medical condition exists.[2] 42 USCA § 1395dd (a). Second, if the hospital determines that an emergency medical condition exists, the hospital must provide further medical examination and treatment of the individual so as "to stabilize"[3] his or her condition or arrange for a

---

[2] EMTALA's definition of "emergency medical condition" is provided at 42 USCA § 1395dd (e) (1) (A)[.]

[3] As used in EMTALA, the term "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or

transfer of the individual to another medical facility, within certain parameters. 42 USCA § 1395dd (b) (1). A hospital may not transfer an individual[, which includes discharging him or her from the emergency department, see 42 USCA § 1395dd (e) (4),] unless his or her condition has stabilized, absent certain defined exceptions.[4] 42 USCA § 1395dd (c) (1). If a hospital violates any of these provisions, EMTALA allows an injured party to "obtain those damages available for personal injury under the law of the State in which the hospital is located." 42 USCA § 1395dd (d) (2) (A).

(Footnotes in original but renumbered; emphasis omitted.) *Quinney v. Phoebe Putney Memorial Hosp.*, 325 Ga. App. 112, 121 (3) (751 SE2d 874) (2013). See *Pham v. Black*, 347 Ga. App. 585, 589 (2) (820 SE2d 209) (2018) (summarizing the pertinent provisions of EMTALA).[5]

---

occur during the transfer of the individual from a facility[.]" 42 USCA § 1395dd (e) (3) (A).

[4] The statute permits a hospital to transfer or discharge a patient whose condition has not stabilized when (1) the patient requests the transfer in writing after being informed of the hospital's obligations under the statute, or (2) a physician certifies that the medical benefits of treatment at another facility outweigh the increased risks to the individual. See 42 USCA § 1395dd (c) (1). Neither of these circumstances is present in this case [based on the allegations of the Estate's complaint, which we accept as true at this stage of the proceedings.]

[5] EMTALA applies to hospitals "that voluntarily participate in the Medicare or Medicaid programs and have effective provider agreements." *Smith v. Albert*

The Estate alleged in its complaint that the Hospital violated both its duty under EMTALA to provide an appropriate medical screening examination to Tomlinson upon her arrival in its emergency department and its duty to stabilize her emergency medical condition before discharging her. We will addresses these alleged violations of EMTALA separately.

(i) *The Estate's EMTALA Screening Claim.* We conclude that the Estate's EMTALA claim against the Hospital for failure to provide an appropriate medical screening examination does not sound in professional negligence and thus is not a claim for professional malpractice within the meaning of OCGA § 9-11-9.1 so as to trigger the expert affidavit requirement imposed by that statute.

The screening provision of EMTALA states in part that a hospital covered by the statute "must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists." 42 USCA § 1395dd (a). EMTALA does not

*Einstein Medical Center*, 378 Fed. Appx. 154, 157, n. 4 (3d Cir. 2010) (per curiam). See 42 USCA § 1395cc (a) (1) (I) (i). The Estate's complaint alleged that the Hospital had executed a Medicare provider agreement.

define the phrase "appropriate medical screening examination." However, construing the statutory language of the screening provision as a whole, we have held that the provision

> requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints. A hospital fulfills the "appropriate medical screening" requirement when it conforms in its treatment of a particular patient to its standard screening procedures. The Act is intended not to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances. The Act does not create a standard of care to be followed, and does not create liability for malpractice based on a breach of a national or community standard of care; at the core, it aims at disparate treatment.

(Citations and punctuation omitted.) *Stokes v. Candler Hosp.*, 216 Ga. App. 132, 133-134 (453 SE2d 502) (1995).

As our decision in *Stokes* makes clear, unlike a professional negligence claim, an EMTALA screening claim is not predicated on a general professional standard of care; instead, EMTALA only requires "an appropriate medical screening examination within the capability of the hospital's emergency department." 42 USCA § 1395dd

12

(a). "This section establishes a standard which will of necessity be individualized for each hospital, since hospital emergency departments have varying capabilities," and if "Congress intended to require hospitals to provide a screening examination which comported with generally accepted medical standards, it could have clearly specified a national standard," which it chose not to do. *Baber v. Hosp. Corp. of America*, 977 F2d 872, 879-880 (IV) (A) (4th Cir. 1992). See *Del Carmen Guadalupe v. Negron Agosto*, 299 F3d 15, 21 (III) (A) (1st Cir. 2002) (noting that "whereas malpractice liability usually attaches when a health care provider fails to adhere to a general professional standard of care," EMTALA establishes a screening standard that is "individualized for each hospital") (citations and punctuation omitted); *Cleland v. Bronson Health Care Group*, 917 F2d 266, 272 (II) (B) (6th Cir. 1990) (concluding that the language of the EMTALA screening provision "precludes resort to a malpractice or other objective standard of care as the meaning of the term 'appropriate'"). The statutory language reflects that "[p]atients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated, within the hospital's capabilities. It is up to the hospital itself to determine what its screening procedures will be." *Summers v. Baptist*

13

*Med. Center Arkadelphia*, 91 F3d 1132, 1138 (II) (8th Cir. 1996). In other words, "[a] disparate screening claim is not a negligence claim because it is based on disparate treatment and does not involve the professional medical standard of care [or ask] how a reasonable hospital in [the defendant hospital's] position would act." *Romar v. Fresno Community Hosp. & Medical Center*, 583 FSupp2d 1179, 1187 (E.D. Cal. 2008). See *Summers*, 91 F3d at 1137 (II) (holding that the EMTALA screening provision "does not guarantee proper diagnosis or provide a federal remedy for medical negligence"); *Vickers v. Nash Gen. Hosp.*, 78 F3d 139, 143 (III) (A) (4th Cir. 1996) (explaining that EMTALA "does not impose any duty on a hospital requiring that the screening result in a correct diagnosis" and that "[i]nstead, questions related to diagnosis remain the exclusive province of local negligence and malpractice law") (citations and punctuation omitted); *Holcomb v. Monahan*, 30 F3d 116, 117 (11th Cir. 1994) ("We reject [the appellant's] argument that the 'appropriateness' of the screening should be determined by the adequacy in identifying the patient's illness. Section 1395dd (a) is not designed to redress a negligent diagnosis by the hospital; no federal malpractice claims are created."); *Gatewood v. Washington Healthcare Corp.*,

14

933 F2d 1037, 1041 (II) (D. C. Cir. 1991) (declining "to incorporate a malpractice or negligence standard into subsection 1395dd (a)").

Because EMTALA screening claims are not professional negligence claims based on a general professional standard of care, the expert affidavit requirement imposed by OCGA § 9-11-9.1 on claims for professional malpractice does not apply. See generally *Labovitz v. Hopkinson*, 271 Ga. 330, 336 (III) (519 SE2d 672) (1999) (explaining that OCGA § 9-11-9.1 is limited to claims grounded in professional negligence); *Brown*, 279 Ga. App. at 166 (explaining that the OCGA § 9-11-9.1 expert affidavit requirement applies in cases centered on "the defendant's compliance with a professional standard of conduct"). Accord *Brooks v. Maryland Gen. Hosp.*, 996 F2d 708, 713 (III) (4th Cir. 1993) (concluding that the Maryland Malpractice Act did not apply to the plaintiff's EMTALA screening claim, since the EMTALA claim was "aimed at disparate screening" while the Malpractice Act "applie[d] only to claims that the standard of care in the community [had] been breached"); *Romar*, 583 FSupp2d at 1185-1190 (concluding that the cap on damages found in the California Medical Injury Compensation Reform Act did not apply to the plaintiff's EMTALA screening claim, given that the cap only applied to injuries based on medical treatment

15

allegedly falling below the professional standard of care, while "EMTALA screening claims are not negligence claims" and instead "focus . . . on disparate treatment"; listing multiple federal cases holding that EMTALA screening claims do not sound in negligence). We therefore reverse the trial court's dismissal of the Estate's EMTALA screening claim for failure to file an expert affidavit.

(ii) *The Estate's EMTALA Stabilization Claim.* In contrast to the Estate's EMTALA screening claim, we conclude that its EMTALA stabilization claim constitutes a claim for professional malpractice within the meaning of OCGA § 9-11-9.1 and thus triggers the expert affidavit requirement.

To succeed on an EMTALA stabilization claim, a plaintiff must show that: (1) the patient had an emergency medical condition; (2) the hospital had actual knowledge of that condition; (3) the hospital failed to provide, with the staff and facilities available to it, further medical examination and treatment as may be necessary to stabilize the patient prior to his or her transfer or discharge; and (4) the patient suffered personal harm as a direct result of that failure.[6] See 42 USCA §

---

[6] As previously noted, EMTALA also permits a hospital to transfer or discharge a patient whose condition has not stabilized under certain limited circumstances not applicable here in light of the allegations of the Estate's complaint. See 42 USCA § 1395dd (c) (1). See also supra footnote 4.

1395dd (b), (d) (2) (A); *Pham*, 347 Ga. App. at 589 (2); *Quinney*, 325 Ga. App. at 121-122 (3); *Stokes*, 216 Ga. App. at 134 . "The term 'to stabilize' means . . . to provide such medical treatment of the [emergency medical] condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 USCA § 1395dd (e) (3) (A). Similarly, "[t]he term 'stabilized' means . . . that no material deterioration of the [emergency medical] condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." 42 USCA § 1395dd (e) (3) (B).

Construing these provisions, we agree with other courts that have held that "compliance with EMTALA's stabilization requirements entails medical judgment," given that the patient must be provided such medical treatment of his or her emergency medical condition as is necessary to assure "'*within reasonable medical probability*, that no material deterioration of the condition is likely.'" (Emphasis in original.) *Smith v. Botsford Gen. Hosp.*, 419 F3d 513, 519 (II) (B) (6th Cir. 2005), quoting 42 USCA § 1395dd (e) (3) (A). See *Kaye v. Nussey*, 670 FSupp3d 149, 166 (III) (C) (D. N. J. 2023) (concluding that the plaintiff's EMTALA stabilization claim

"involve[d] medical judgment and consideration of expert testimony to determine whether the [patient] was 'stabilized.'"). Furthermore, "[i]n stabilizing a patient, a hospital must, within the staff and facilities available to it, meet requirements that relate to the prevailing standard of professional care: it must give the treatment medically necessary to stabilize a patient." *Barris v. County of Los Angeles*, 972 P2d 966, 972 (II) (Cal. 1999).

Because compliance with the EMTALA stabilization requirements involves the exercise of medical judgment and a reliance on general standards of professional care in evaluating the treatment given to stabilize the patient, we conclude that an EMTALA stabilization claim is "a claim against [a] hospital based upon the negligent act of a professional using his professional judgment and skill" and therefore is subject to the expert affidavit requirement imposed by OCGA § 9-11-9.1. *Upson County Hosp. v. Head*, 246 Ga. App. 386, 390 (1) (540 SE2d 626) (2000). See *Merritts*, 366 Ga. App. at 760 (1); *Ziglar*, 341 Ga. App. at 374-375. Accord *Smith*, 419 F3d at 519 (II) (B) (concluding that the plaintiff's EMTALA stabilization claim constituted a malpractice action under Michigan law, as the claim involved the exercise of medical judgment that could only be evaluated through expert testimony); *Kaye*, 670 FSupp3d at 166-167

(III) (C) (concluding that the plaintiff's EMTALA stabilization claim constituted a malpractice action under New Jersey law because it was "essentially negligence based and would fall within the scope of common law negligence") (citation and punctuation omitted); *Barris*, 972 P2d at 972 (II) (determining that plaintiff's EMTALA stabilization claim was "necessarily based on professional negligence" within the meaning of California law, as it involved "a negligent omission to act by a health care provider in the rendering of professional services") (citation and punctuation omitted).[7]

---

[7] In *Quinney*, we concluded that there was sufficient evidence to support the plaintiffs' EMTALA stabilization claim to create a genuine issue of material fact, such that the trial court erred in granting summary judgment to the defendant hospital on that claim. 325 Ga. App. at 121-123 (3). In the course of that discussion, we made reference in a footnote to OCGA § 51-1-29.5, which requires clear and convincing evidence of gross negligence "[i]n an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department." OCGA § 51-1-29.5 (c). See *Quinney*, 325 Ga. App. at 122 (3), n. 11. We commented:

> We recognize that claims under OCGA § 51-1-29.5 require clear and convincing evidence of gross negligence. However, EMTALA does not appear to provide any such evidentiary burden. Therefore, we note, *without expressly holding*, that EMTALA could authorize a finding of liability without any finding of gross negligence on the part of the hospital. The [plaintiffs'] theory of liability is based on an alleged violation of [the EMTALA stabilization provision], and such a claim cannot be construed as a negligence or a malpractice claim. See *Morgan* [*v. North Miss. Medical Center*, 403 FSupp2d 1115, 1130-1131 (II) (C) (4)

(b) *Whether Application of the OCGA § 9-11-9.1 Affidavit Requirement to the Estate's EMTALA Stabilization Claim is Preempted by Federal Law.* The Estate argues that even if EMTALA stabilization claims fall within the scope of the OCGA § 9-11-9.1 expert affidavit requirement, that requirement is preempted by federal law, but we are unpersuaded by that argument.

"The Supremacy Clause of the United States Constitution mandates that federal law will preempt a state law that is inconsistent with it. U. S. Const., Art. VI, cl. 2." *Reis v. OOIDA Risk Retention Group*, 303 Ga. 659, 660 (814 SE2d 338) (2018).

---

(S. D. Ala. 2005)].
(Emphasis supplied.) Id. As the emphasized language of the footnote expressly reflects, our statement regarding whether a violation of the EMTALA stabilization could be construed as a negligence or malpractice claim was dicta. And, in any event, our statement was made in the context of a discussion of the application of OCGA § 51-1-29.5 to EMTALA stabilization claims rather than the application of OCGA § 9-11-9.1, and thus the statement in *Quinney* is inapposite to the present case. Furthermore, the federal district court's decision in *Morgan*, which we cited in the footnote in *Quinney*, did not address the application of state procedural rules for malpractice actions to EMTALA claims. Rather, the district court in *Morgan* addressed whether the allegations in the plaintiff's complaint raised a viable EMTALA stabilization claim or instead should be construed as a "concealed negligence or malpractice claim," since in that case there was a nine-day interval between when the plaintiff arrived at the hospital and his discharge. See *Morgan*, 403 FSupp2d at 1127-1131 (II) (C) (4). Hence, *Morgan* also is inapposite.

"Whether federal statutes or regulations preempt state law is a question of congressional intent." *Smith v. Hi-Tech Pharmaceuticals*, 364 Ga. App. 476, 478 (1) (875 SE2d 454) (2022). Congress, through federal statutes or regulations, can preempt state law in three different ways: (i) express preemption; (ii) implied (or conflict) preemption; and (iii) field preemption. Id. Express preemption occurs when Congress expressly defines the preemptive effect of a federal statute in the statutory language. Id. Implied or conflict preemption occurs where a federal statute and state statute directly conflict so as to make "compliance with both federal and state [law] a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Ward v. McFall*, 277 Ga. 649, 651-652 (2) (593 SE2d 340) (2004), quoting *Gade v. Nat. Solid Waste Mgmt. Assn.*, 505 U. S. 88, 98 (II) (112 SCt 2374, 120 LE2d 73) (1992). Field preemption occurs where the scheme of federal legislation "is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Id.

(i) *Express Preemption.* EMTALA contains an express preemption clause that provides: "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a

requirement of this section." 42 USCA § 1395dd (f). By its plain language, the EMTALA preemption clause applies only when a state or local requirement is in direct conflict with a requirement imposed by EMTALA. A direct conflict exists when complying with both federal and state law is a "physical impossibility" or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Ward*, 277 Ga. at 652 (2), quoting *Gade*, 505 U.S. at 98 (II). See *Hardy v. New York City Health & Hosps. Corp.*, 164 F3d 789, 795 (IV) (2d Cir. 1999); *Draper v. Chiapuzio*, 9 F3d 1391, 1393 (9th Cir. 1993) (per curiam).

Compliance with both EMTALA and the OCGA § 9-11-9.1 expert affidavit requirement is not a physical impossibility. EMTALA contains no procedural rules with which the expert affidavit requirement conflicts. And while EMTALA has a two-year statute of limitation, see 42 USCA § 1395dd (d) (2) (C), it is possible for a plaintiff to acquire an expert affidavit and file suit within that limitation period.

Nor does the OCGA § 9-11-9.1 expert affidavit requirement serve as an obstacle to Congress's purposes and objectives under EMTALA. The primary objective of Congress in enacting EMTALA was "to prevent patient dumping, the practice of some hospital emergency rooms turning away or transferring indigents to public

22

hospitals without prior assessment or stabilization treatment." (Citation and punctuation omitted.) *Pham*, 347 Ga. App. at 589 (2). The expert affidavit requirement imposed by OCGA § 9-11-9.1 is not inconsistent with that objective. Rather, it addresses a different concern: shielding professionals from "the harm done by groundless malpractice litigation." (Citation and punctuation omitted.) *Labovitz*, 271 Ga. at 336 (3). See *Housing Auth. of Savannah v. Greene*, 259 Ga. 435, 438 (5) (383 SE2d 867) (1989) ("The purpose of OCGA § 9–11–9.1 is to reduce the number of frivolous malpractice suits being filed[.]") (citation and punctuation omitted). The expert affidavit requirement "is not so burdensome or inconsistent with the objectives of [EMTALA] that it frustrates Congress['s] purposes in enacting it." *Draper*, 9 F3d at 1393.

For the foregoing reasons, we conclude that the OCGA § 9-11-9.1 expert affidavit requirement is not expressly preempted by EMTALA. Compare *Power v. Arlington Hosp. Assn.*, 42 F3d 851, 866 (II) (B) (3) (4th Cir. 1994) (concluding that Virginia's special procedural requirements for malpractice actions — which required, *before* a lawsuit could be filed, that plaintiffs provide a written notice of their claims to the defendant health care provider and *then* submit their claims for review to a medical

malpractice review panel if one was requested — were preempted by EMTALA because the requirements conflicted with the two-year statutory limitation period imposed by EMTALA, which could not be tolled); *Spradlin v. Acadia-St. Landry Medical Foundation*, 758 So2d 116, 123 (La. 2000) (concluding that Louisiana's medical review panel requirement was preempted by EMTALA because "the period of time a medical review panel takes to render a decision is outside of the malpractice victim's control, and extensions of the time for the panel decision are common so that the timing of the decision frequently occurs outside the two-year period for filing an EMTALA claim"), with *Hardy*, 164 F3d at 795 (IV) (concluding that New York's notice-of-claim law was not preempted by EMTALA because it was not physically impossible to comply with the notice requirement and EMTALA's two-year statute of limitations, and because the requirement did not "thwart" EMTALA's purpose, which was "to prevent hospitals from failing to examine and stabilize uninsured patients who seek emergency treatment"), and *Draper*, 9 F3d at 1393 (concluding that Oregon's tort claim notice requirement was not preempted by EMTALA because the plaintiff could provide the required notice and still file his or her lawsuit within the

two-year limitation period imposed by EMTALA, and because the notice requirement was not an obstacle to EMTALA's objective of combating "patient dumping").

(ii) *Implied (or Conflict) Preemption.* "While the existence of an express preemption clause does not necessarily preclude the presence of implied preemption, an express definition of the [preemptive] reach of a statute . . . supports a reasonable inference . . . that Congress did not intend to [preempt] other matters." (Citations and punctuation omitted.) *Smith*, 364 Ga. App. at 484 (1). In any event, the express preemption provision in EMTALA essentially incorporates the test for implied, or conflict, preemption. See 42 USCA § 1395dd (f); *Hardy*, 164 F3d at 795 (IV); *Draper*, 9 F3d at 1393 . Hence, any implied preemption argument regarding the OCGA § 9-11-9.1 expert affidavit requirement and EMTALA fails for the same reasons set out in our discussion of express preemption. See supra Division (1) (b) (i).

(iii) *Field Preemption.* Field preemption arises when federal law "regulat[es] the field so extensively that Congress clearly intends the subject area to be controlled only by federal law." (Citation and punctuation omitted.) *Smith*, 364 Ga. App. at 479 (1). That is not the case with respect to EMTALA. There is nothing in the language of EMTALA reflecting an intent to occupy the entire field or to restrict claims to federal

court or federal procedural rules. Indeed, the language and structure of EMTALA, including the language of its express preemption provision (see 42 USCA § 1395dd (f)), reflect the opposite. As explained by the Eleventh Circuit, EMTALA "was not intended to be a federal malpractice statute, but instead was meant to supplement state law solely with regard to the provision of limited medical services to patients in emergency situations," and it "was not intended . . . to replace available state remedies." *Harry*, 291 F3d at 773 (III) (B). See *Hardy*, 164 F3d at 792 (II) ("EMTALA is not a substitute for state law on medical malpractice."). Consequently, there is no field preemption. See *Miller v. Patel*, 174 NE3d 1061, 1067 (II) (Ind. 2021) (concluding that field preemption did not apply in context of EMTALA).

In sum, for the reasons discussed above, we conclude that the OCGA § 9-11-9.1 expert affidavit requirement applies to EMTALA stabilization claims and is not preempted by federal law. Accordingly, the trial court committed no error in dismissing the Estate's EMTALA stabilization claim for failure to include an expert affidavit.[8]

---

[8] In a separate enumeration of error, the Estate asserts that the trial court erred in not transferring its EMTALA claims to federal court. But the Estate has abandoned this claim of error by failing to support its conclusory assertion with any citation to state or federal legal authority or meaningful argument. See Court of Appeals Rule 25

2. *The Estate's Negligence Claims.* The Estate also argues that the trial court erred in dismissing its negligence claims for failure to file an OCGA § 9-11-9.1 expert affidavit with its complaint. According to the Estate, its complaint raised claims for gross negligence rather than professional negligence, and thus no affidavit was required.

The Estate's argument is without merit. The question whether a plaintiff must prove gross negligence under Georgia's emergency medical statute, OCGA § 51-1-29.5, to succeed on a professional malpractice claim is a separate question from whether the plaintiff must file an expert affidavit with his or her complaint under OCGA § 9-11-9.1. See *Graham v. Reynolds*, 343 Ga. App. 274, 281 (3) (807 SE2d 39) (2017) (contrasting OCGA § 51-1-29.5, which imposes an evidentiary requirement, with OCGA § 9-11-9.1, which imposes a pleading requirement). As previously noted, whether a hospital must file an expert affidavit with its complaint for a negligence

(d) (1) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned."); *In re Estate of Burkhalter*, 354 Ga. App. 231, 237 (2) (a), n. 32 (840 SE2d 614) (2020) ("Mere conclusory statements are not the type of meaningful argument contemplated by our rules.") (citation and punctuation omitted); *Gresham v. Harris*, 349 Ga. App. 134, 138 (1), n. 9 (825 SE2d 516) (2019) (explaining that "cogent legal analysis . . . is, at a minimum, a discussion of the appropriate law as applied to the relevant facts") (citation, punctuation, and emphasis omitted).

claim hinges on whether its liability is predicated on the action or inaction of a licensed health care professional listed in OCGA § 9-11-9.1 (g). See OCGA § 9-11-9.1 (a) (3); *Minnix*, 272 Ga. at 570-571 (3). And the Estate has failed to explain why its common law negligence claims predicated on the failure of the Hospital's medical staff to properly assess and treat her medical condition should be construed as anything other than professional malpractice claims. See, e.g., *Ziglar*, 341 Ga. App. at 374-375 (concluding that claims that Hospital medical staff failed to properly assess, prescribe, and implement a course of treatment constituted professional malpractice claims requiring an OCGA § 9-11-9.1 expert affidavit); *Bradford v. Rossi*, 249 Ga. App. 325, 326 (1) (548 SE2d 70) (2001) (concluding that "[a] claim of abandonment [of a patient], which is a tort, amounts to the same as negligent treatment" and requires an OCGA § 9-11-9.1 expert affidavit) (citation and punctuation omitted). Consequently, the Estate has shown no error by the trial court in dismissing its negligence claims for failure to satisfy the expert affidavit requirement.

3. Lastly, the Estate argues that the trial court erred in dismissing its claim for failure to maintain medical records. In its complaint, the Estate argued that the Hospital was liable for failing to maintain Tomlinson's medical records from her

28

emergency department visit and failing to produce them to the Estate's executrix. In its appellate brief, the Estate cites to 42 CFR § 424.516 (f) and OCGA § 31-33-2 and asserts that it could pursue its medical records claims based on that federal regulation and state statute.

However, the Estate has not shown — "by proffer of principles of statutory construction, case law, or any other legal analysis" — that either 42 CFR § 424.516 (f) or OCGA § 31-33-2 create a private right of action or otherwise impose a duty enforceable through civil litigation. *Dunn v. Dunn*, 363 Ga. App. 132, 135 (1) (a), n. 5 (871 SE2d 30) (2022). Because the Estate's brief does not include a discussion of "the appropriate law as applied to the relevant facts," this claim of error is deemed abandoned. *Dixon v. MARTA*, 242 Ga. App. 262, 266 (4) (529 SE2d 398) (2000). See supra footnote 7; Court of Appeals Rule 25 (d) (1).

*Judgment affirmed in part and reversed in part. Gobeil and Pipkin, JJ., concur.*